**HOSPITAL & SERVICE EMPLOYEES UNION, LOCAL 399, SERVICE EMPLOYEES INTERNATIONAL UNION, AFL–CIO, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

and

**Delta Air Lines, Inc., Intervenor.**

Nos. 83–7060, 83–7145.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 4, 1984.

Resubmitted March 1, 1984.

Decided Oct. 2, 1984.

Jeffrey Paule, Geffner & Satzman, Los Angeles, Cal., for petitioner.

Elinor Hadley Stillman, NLRB, Washington, D.C., for respondent.

Leslie P. Klemperer, Atlanta, Ga., for Delta Airlines, Inc.

Before CHOY, FARRIS, and NORRIS, Circuit Judges.

CHOY, Circuit Judge:

Petitioner Hospital and Service Employees Union Local 399, Service Employees International Union, AFL–CIO ("Union") appeals from a National Labor Relations Board ("NLRB") order requiring it to cease and desist from distributing certain handbills and publishing certain advertisements.

In this appeal we consider the issue of whether the NLRB properly applied a twenty-five-year-old statutory provision in the National Labor Relations Act ("the Act") to a set of facts no court has yet addressed. We set aside the order of the Board and remand for further proceedings consistent with this opinion.

I.

A.

All parties stipulated to the relevant facts. From July 1, 1975 to December 16, 1976, intervenor Delta Air Lines, Inc. ("Delta") subcontracted the janitorial work for its administrative offices at the Los Angeles International Airport to National Cleaning Company ("National"). National signed a collective bargaining agreement with the Union.

On December 16, 1976, Delta lawfully terminated its subcontract with National and made a new contract with Statewide Maintenance Company ("Statewide"), a nonunion employer. As a result, National released five of the six Union employees, who had cleaned the Delta offices, and transferred the remaining employee to another job. Since the date of Delta's cancellation of its subcontract with National, the Union has had a primary labor dispute with Statewide, not Delta.

On September 22, 1977, in furtherance of its primary dispute with Statewide, the Union began distributing handbills at Delta's Los Angeles International Airport facility and in front of Delta's downtown Los Angeles office. At the airport facility, one, and sometimes two, individuals distributed handbills in front of Delta's ticket area near its curb-side check-in stand. One individual distributed handbills on the sidewalk in front of Delta's downtown office. The handbilling did not cause any interruptions in deliveries to Delta or any refusals by Delta employees to perform work-related activities.

The Union distributed four different handbills, which the Board referred to as handbills "A", "B", "C", and "D". Hand-

bill "A", distributed from September 23 to October 3, 1977, consisted of two sides. One side read, "Please do not fly Delta Airlines. Delta Airlines unfair. Does not provide AFL–CIO conditions of employment. Hospital & Service Employees Union, Local 399, AFL–CIO."

The second side stated, "It takes more than money to fly Delta. It takes nerve. Let's look at the accident record." It then listed 55 accidents involving Delta that had occurred during the period of January 13, 1963, to May 27, 1976, their locations, the type of aircraft involved, the degree of damage, and whether there had been injuries or deaths. This side of handbill "A" also provided the total number of deaths and injuries in these accidents and stated that the information was obtained from the National Transportation Board ("NTB"), Washington, D.C. Finally, it listed the numbers of the letters and complaints that Delta received monthly from July 1976 to July 1977, and stated that this information was obtained from the Civil Aeronautics Board ("CAB"), Washington, D.C.

Handbill "B", distributed from October 6 to October 12, 1977, contained all of the information set forth on side two of handbill "A". It did not list, however, the information pertaining to the letters and complaints received by Delta.

Handbill "C", distributed from October 13 to December 28, 1977, consisted of two sides. The first side read as follows:

Please Do Not Fly Delta Airlines. This airline has caused members of Service Employees Union, Local 399, AFL–CIO, at Los Angeles International Airport, to become unemployed. In their place they have contracted with a maintenance company which does not provide Local 399 wages, benefits and standards. We urge all union members to protest Delta's action to the Delta office in your region. If you are concerned about the plight of fellow union members ... Please Do Not Fly Delta Airlines.

The other side of handbill "C" listed the identical accident and consumer complaint

information as that contained on side two of handbill "A".

The Union distributed handbill "D" from January 3 to March 1, 1978, when the United States District Court for the Central District of California temporarily enjoined its distribution. This handbill was similar to handbill "C", except that on side one it identified the "maintenance company" as Statewide, and on side two, before listing Delta's accident and consumer complaint records, it included the following prefatory statement:

> As members of the public and in order to protect the wages and conditions of Local 399 members and to publicize our primary dispute with the Statewide Building Maintenance Company, we wish to call to the attention of the consuming public certain information about Delta Airlines from the official records of the Civil Aeronautics Board of the United States Government.

Simultaneous with the handbilling, the Union published copies of handbills "A" and "C" in two Union newspapers, the Service Union Reporter and the Service Union Reporter, Political Action Report. The Union also published in these two newspapers a block advertisement that stated, "Do Not Fly Delta."

## B.

Congress added the provisions of the Act at issue here in 1959 as part of the Labor-Management Reporting and Disclosure Act, commonly known as the Landrum-Griffin amendments. Pub.L. No. 86–257, § 704(a), 73 Stat. 519, 542–43 (1959). This amendment attempted to plug loopholes in the secondary boycott provisions of the earlier Taft-Hartley Act. The relevant part of the amended section 8(b)(4) makes it an unfair labor practice for a labor organization to:

> threaten, coerce, or restrain any person engaged in commerce or in any industry affecting commerce, where in either case an object thereof is—

> (B) forcing or requiring any person ... to cease doing business with any other person ....

29 U.S.C. § 158(b)(4)(ii)(B).

Possible first amendment problems with this provision concerned some members of Congress. *See* 105 Cong.Rec. 16,591 (1959) (remarks of Sen. Kennedy); *id.* at 15,540–41 (remarks of Rep. Thompson); *id.* at 6231–32 (remarks of Sen. Humphrey). *See generally NLRB v. Fruit & Vegetable Packers (Tree Fruits),* 377 U.S. 58, 69–70, 84 S.Ct. 1063, 1069–1070, 12 L.Ed.2d 129 (1964). Congress, therefore, also enacted in 1959 a proviso to this section, known as the "publicity proviso," which exempts from its prohibitions:

> publicity, other than picketing, for the purpose of truthfully advising the public, including consumers and members of a labor organization, that a product or products are produced by an employer with whom the labor organization has a primary dispute and are distributed by another employer, as long as such publicity does not have an effect of inducing any individual employed by any person other than the primary employer in the course of his employment to refuse to pick up, deliver, or transport any goods, or not to perform any services, at the establishment of the employer engaged in such distribution.

29 U.S.C. § 158(b)(4).

## C.

After Delta first filed an unfair labor practice charge and the NLRB General Counsel issued a complaint against the Union, all parties moved that the case be transferred to the NLRB. Attached to the motion was a stipulation of facts. On July 7, 1978, the NLRB granted the motion. Almost eleven months later, on March 13, 1979, the Board issued an order remanding the case to the Regional Director "for further proceedings, including a hearing on all issues."

An administrative law judge held a hearing on July 10, 1979. The factual evidence submitted principally consisted of the origi-

nal stipulation of facts and a short addendum to it. On December 11, 1979, the administrative law judge found that the Union had violated section 8(b)(4)(ii)(B) of the Act. Thereafter, the Union and the General Counsel filed exceptions and supporting briefs, and Delta filed cross-exceptions and a supporting brief.

A majority of the NLRB[1] held that the Union's handbilling and advertisements violated section 8(b)(4)(ii)(B) of the Act because its conduct was "designed to bring economic pressure on Delta for the purpose of forcing Delta to cease doing business with Statewide, the primary." 263 N.L.R.B. 996, 997 (1982). The NLRB also concluded that the handbills and advertisements did not comply with the requirements of the publicity proviso.

As to handbills "A" and "B", the Board noted that neither handbill mentioned Statewide, the primary. The NLRB reasoned, "Handbills A and B, by failing to identify the primary dispute, were not 'for the purpose of truthfully advising the public' within the meaning of the proviso ...." *Id.*

Although the Board recognized that handbills "C" and "D" identified the nature of the primary dispute, it noted that "they also include the NTB and CAB information which pertains only to Delta, the secondary employer, and is totally unrelated to Delta's connection with [the Union's] primary labor dispute." *Id.* The Board then found that the publicity proviso does not protect this information. The Board reasoned that the express language of the proviso "requires that *all* coercive information that is contained in publicity must be included for the purpose of truthfully advising the public of the nature of the primary dispute." *Id.* at 998.

The NLRB also held that the publication of handbills "A" and "C" in the Union newspapers violated section 8(b)(4)(ii)(B) for the same reasons the handbills violated this section. Finally, the Board refused to address the first amendment issue raised by the Union. It concluded that "as an administrative agency created by Congress, we will presume the constitutionality of the Act we are charged with administering, absent binding court decisions to the contrary." *Id.* at 999.

## II.

Delta cannot obtain relief in this proceeding unless it prevails on three separate issues. It must prove that the Union did "threaten, coerce, or restrain" Delta, with the object of "forcing or requiring" Delta to cease doing business with Statewide— "that is to say, it must prove a violation of § 8(b)(4)(ii)(B). It must also overcome both the union's defense based on the publicity proviso and the union's claim that its conduct was protected by the First Amendment." *Edward J. DeBartolo Corp. v. NLRB,* 463 U.S. 147, ___, 103 S.Ct. 2926, 2931, 77 L.Ed.2d 535 (1983).

The Union initially made only the publicity proviso and the first amendment arguments before this court. It did not make any arguments on the statutory issue. We consider first the publicity proviso issue.

■ The publicity proviso exempts from the proscription of section 8(b)(4) all publicity *"for the purpose* of truthfully advising the public ... that a product or products are produced by an employer with whom the labor organization has a primary dispute and are distributed by another employer ...." 29 U.S.C. § 158(b)(4) (emphasis added). The facts of this case require us to determine the scope of the publicity

---

**1.** The majority consisted of Chairman Van de Water and Members Fanning and Hunter. Member Jenkins concurred with the majority that the publicity proviso did not protect the Union's handbills. He disagreed with the majority's conclusion that the newspaper advertisements violated the Act, reasoning that they were not "coercion" within the meaning of section 8(b)(4)(ii)(B). 263 N.L.R.B. 996, 1004 (1982).

Member Zimmerman concurred with the majority that the publicity proviso did not protect handbills "A" and "B" or the publication of handbill "A" in the Union's newspapers. He partially dissented, however, on the ground that the publicity proviso fully protected handbills "C" and "D". *Id.* at 1010.

proviso's exemption in light of the limiting language of the "for the purpose of" clause. The NLRB decision stated, "[i]t is clear from the express language of the proviso that at the very least the proviso requires publicity to advise the public of the nature of the primary dispute and the secondary employer's relationship to it." 263 N.L.R.B. at 997. We agree.

To not understand the proviso in this manner would be to ignore its express and clear meaning. In interpreting other restrictive language in the publicity proviso, the Supreme Court recently has recognized that such language must be given its limiting effect. *See Edward J. DeBartolo Corp. v. NLRB*, 463 U.S. 147, 103 S.Ct. 2926, 2932, 77 L.Ed.2d 535 (1983). Thus, the Union's handbills, at the very least, must identify the nature of the Union's dispute with Statewide and Delta's relationship to it.

■ We conclude that handbills "A" and "B" do not meet this minimum requirement. Neither handbill identifies Statewide as the employer with whom the Union has a primary labor dispute. Handbill "A" states only, "Delta Airlines Unfair," and then lists Delta's accident and consumer complaint records. Handbill "B" lists only the accident and consumer complaint information. Because both handbills fail to explain Delta's relationship to the Union's primary dispute with Statewide, they do not fall within the protection of the publicity proviso.

■ Although the Union does not concede the impropriety of handbills "A" and "B", it contends that "any such deficiency in those handbills is *de minimis* in light of the short period of time they were distributed and the Union's decision to remove them from circulation." In fact, however, the Union distributed each handbill for a

significant period of time, about one week each, eight hours a day. This amount of time does not make the General Counsel's complaint against the Union groundless and unreasonable and therefore *de minimis*. *Cf. Kostiuk v. Town of Riverhead*, 570 F.Supp. 603, 610–11 (E.D.N.Y.1983) (summary of *de minimis* claims). Moreover, that the Union "voluntarily" withdrew the handbills does not render the issue moot because cessation of the challenged conduct, particularly in the area of labor-management conflict, does not ensure that it will not recur. *See NLRB v. Raytheon Co.*, 398 U.S. 25, 27–28, 90 S.Ct. 1547, 1548–1549, 26 L.Ed.2d 21 (1970).

We conclude, therefore, that the publicity proviso does not exempt handbills "A" and "B" from the prohibitions in the secondary boycott provision. These handbills do not meet a minimum requirement of the publicity proviso; they fail to identify the nature of the Union's dispute with Statewide and Delta's relationship to it. Furthermore, and for the same reason, the publicity proviso does not protect the publication of handbill "A" in the Union's newspaper or the block advertisements that stated, "Do Not Fly Delta."

■ Handbills "C" and "D", on the other hand, meet this minimum requirement. Each handbill identifies the primary dispute on one side.[2] The NLRB nevertheless held that the publicity proviso does not protect these handbills because the other side of both handbill "C" and "D" also included the unrelated accident and consumer complaint information. The Board reasoned that the express language of the "for the purpose of" phrase in the proviso "requires that *all* coercive information that is contained in publicity must be included for the purpose of truthfully advising the public of the nature of the primary dispute." 263 N.L.R.B. at 998.

---

**2.** Delta contends that handbill "C" does not identify the primary dispute because it fails to name Statewide specifically. The handbill states only that Delta has contracted with a "maintenance company" which does not provide union wages and benefits. We conclude, however, that this side of handbill "C" sufficiently

describes the nature of the primary dispute. It clearly reveals that a maintenance company, not Delta, was directly responsible for hiring non-union labor. *See Central Indiana Building and Construction Trades Council*, 257 N.L.R.B. 86, 88–89 (1981).

The Union contends that the legislative history of the publicity proviso does not support the NLRB's restrictive interpretation. In 1959, the Senate and House formed a Conference Committee because they were unable to resolve the differences between the Landrum-Griffin bill passed by the House, H.R. 8342, 86th Cong., 1st Sess. (1959), and the Kennedy-Ervin bill passed by the Senate, S. 1555, 86th Cong., 1st Sess. (1959). The publicity proviso resulted from a compromise in this Conference Committee. Most of the legislative history for the publicity proviso, therefore, comes from comments made by Senator Kennedy, who chaired the Committee.

The Union has quoted the following statement made by Senator Kennedy on the floor of the Senate:

(c) the right to appeal to consumers by methods other than picketing asking them to refrain from buying goods made by nonunion labor and to refrain from trading with a retailer who sells such goods.

Under the Landrum-Griffin bill it would have been impossible for a union to inform the customers of a secondary employer that that employer or store was selling goods which were made under racket conditions or sweatshop conditions, or in a plant where an economic strike was in progress. We were not able to persuade the House conferees to permit picketing in front of that secondary shop, but we were able to persuade them to agree that the union shall be free to conduct informational activity short of picketing. In other words, the union can hand out handbills at the shop, can place advertisements in newspapers, can make announcements over the radio, and can carry on all publicity short of having ambulatory picketing in front of a secondary site.

105 Cong.Rec. 17,898–99. The Union argues that *"all* publicity" (in the last sentence of the quote) means that the Union may distribute any information, short of picketing, including the accident and consumer complaint records of Delta.

We conclude, however, that this legislative history, and other legislative history cited by the Union,[3] is not conclusive. In the context of Senator Kennedy's entire remarks, his reference to "all publicity" may have been to the means of publicity, not the content of such publicity, protected by the proviso. Under this interpretation, the publicity proviso protects any form or type of publicity, other than picketing, but it does not protect publicity which is not for the purpose of advising the public about the primary dispute. At the very least, Senator Kennedy's remarks suggest that he did not have the facts of the instant case in mind when he spoke on the Senate floor. We therefore will not use this legislative history to make any conclusive interpretations of the publicity proviso.

The Union next argues that judicial precedent requires this court to adopt its interpretation of the proviso. The Union cites several cases that interpret the proviso broadly and give it an expansive construction. In *NLRB v. Servette, Inc.,* 377 U.S. 46, 84 S.Ct. 1098, 12 L.Ed.2d 121 (1964), the Supreme Court addressed the issue of whether the primary employer involved in a labor dispute must "produce" a tangible good in order for the union's publicity to fall within the protection of the publicity proviso. The Court ruled that products "produced" by an employer include products distributed by a wholesaler with whom the primary dispute exists. *Id.* at 56, 84 S.Ct. at 1104. The Court therefore construed the word "produced" in the publicity proviso broadly and noted:

There is nothing in the legislative history which suggests that the protection of the proviso was intended to be any narrower in coverage than the prohibition to which

---

3. *See* 105 Cong.Rec. 17,720 (1959) (remarks of Sen. Kennedy); 105 Cong.Rec. 16,591 (1959) (remarks of Cong. Thompson and Sen. Kennedy). These excerpts do not specifically address the issue of this case. Rather, they point out the possible first amendment problems with the House bill, which prohibited not only picketing, but also all forms of handbilling. *See* H.R. 8342, 86th Cong., 1st Sess. (1959).

it is an exception, and we see no basis for attributing such an incongruous purpose to Congress.

*Id.* at 55, 84 S.Ct. at 1104. This court has cited the *Servette* language, ruling that products produced by an employer include advertising services. *Great Western Broadcasting Corp. v. NLRB*, 356 F.2d 434, 436–37 (9th Cir.), *cert. denied*, 384 U.S. 1002, 86 S.Ct. 1924, 16 L.Ed.2d 1015 (1966); *see also NLRB v. Fruit & Vegetable Packers (Tree Fruits)*, 377 U.S. 58, 70–71, 84 S.Ct. 1063, 1070–1071, 12 L.Ed.2d 129 (1964).

The Union argues that from this line of cases emerges a rule that courts should construe the publicity proviso broadly. We note initially, however, that the publicity at issue in these cases did not contain information concerning the secondary employer unrelated to the primary dispute. The facts of this case simply differ.

Furthermore, the Supreme Court recently qualified this judicial history of expansive interpretations of the publicity proviso. In *Edward J. DeBartolo Corp. v. NLRB*, 463 U.S. 147, 103 S.Ct. 2926, 77 L.Ed.2d 535 (1983), the union distributed handbills at a shopping mall advising consumers that the mall owner was permitting a nonunion contractor to construct a department store on the mall premises. The Court held that the publicity proviso did not protect the union's handbilling because DeBartolo did not "distribute" any product produced by the contractor. *Id.* at 2932.

The Court indicated that the "for the purpose of" language in the publicity proviso should be given its full limiting effect. It stated:

We reject, however, the Board's interpretation of the extent of the secondary activity that the proviso permits. The only publicity exempted from the prohibition is publicity intended to inform the public that the primary employer's product is "distributed by" the secondary employer. We are persuaded that Congress included that requirement to reflect the concern that motivates all of § 8(b)(4): "shielding ... unoffending employers and others from pressures in controversies not their own."

*Id.* (ellipsis in original). The Court also suggested that the *Servette* decision should be limited to its facts. After citing the *Servette* language, quoted above, the Court noted that "[t]he focus of the analysis in *Servette* was on the meaning of the term 'producer'." *Id.*

*DeBartolo* at the very least stands for the proposition that the scope of the publicity proviso's coverage is not unlimited and, therefore, its language must be given its intended effect. We therefore look at the words of the publicity proviso and give them their full meaning.[4] The proviso states that publicity "for the purpose of truthfully advising the public" about the primary labor dispute may not be prohibited. 29 U.S.C. § 158(b)(4). The Delta consumer complaint and accident information, however, cannot be said to fulfill this protected purpose. As the Union admits, this information is totally unrelated to the primary dispute.

The proviso's language does not support the Union's interpretation of it. The "for the purpose of" language does not suggest that the publicity may include additional information once the primary dispute is identified. If Congress had intended this interpretation, the proviso could have pro-

---

**4.** The Union argues that a strict or literal reading of the proviso would have the effect of reading the proviso completely out of the Act. The Union reasons that if the language of the proviso is to be read to permit a union to circulate publicity only for the purpose of informing the public of the primary dispute, the proviso would not be necessary because such activity by a union does not even violate section 8(b)(4). The requisite improper "object" of coercion is not present.

The Union's argument, however, ignores the legislative history. Congress clearly intended the proviso to allow a union to disseminate truthful publicity which calls for a consumer boycott. *See* 105 Cong.Rec. 17,898–99 (1959) (statement of Sen. Kennedy). Our reading of the proviso, on the other hand, does not ignore the legislative history. As discussed above, the legislative history simply does not offer any guidance for resolving the particular issue of this case.

vided explicitly that the publicity only need to identify the primary dispute rather than be "for the purpose of" advising the public about the primary dispute. The proviso protects only publicity that falls within the protected purpose. To interpret the language otherwise would ignore its plain meaning.

We conclude that handbills "C" and "D" do not fall within the protection of the publicity proviso.[5] For the same reasons, we also agree with the NLRB that the publicity proviso does not protect the newspaper advertisement, which reprinted handbill "C". In reaching this conclusion, we are mindful of the Supreme Court's admonition that if the NLRB's "construction of a statute is reasonably defensible, it should not be rejected merely because the court might prefer another view of the statute." *Ford Motor Co. v. NLRB*, 441 U.S. 488, 497, 99 S.Ct. 1842, 1849, 60 L.Ed.2d 420 (1979) (citation omitted).

## III.

We therefore hold that the publicity proviso does not protect any of the Union's handbills or newspaper advertisements. Anticipating this possible result, the Union in its opening brief argued that we must then address an important constitutional issue. Specifically, the Union contends that the free speech provision of the first amendment protects its advertisements and handbills. To address this serious constitutional issue without first having the Board fully consider the preliminary statutory issue, however, troubles us.

Faced with this procedural posture, which in effect allows the parties to force this court to decide a serious constitutional claim by the simple expedient of not fully asserting a predicate statutory issue, we asked the parties to file supplemental briefs addressing the following questions:

1. Was there "coercion" within the circumstances shown on the record within the meaning of 29 U.S.C. § 158(b)(4)(ii)(B)?
2. Does 29 U.S.C. § 160(e) preclude review by this court of the "coercion" issue?

The NLRB and Delta argue that section 10(e) of the Act, 29 U.S.C. § 160(e), precludes review of the coercion issue by this court. That section, in relevant part, provides:

> No objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances.

29 U.S.C. § 160(e); *see Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645, 665–66, 102 S.Ct. 2071, 2082–83, 72 L.Ed.2d 398 (1982); *NLRB v. Maxwell*, 637 F.2d 698, 701 n. 1 (9th Cir.1981).

■ After an examination of the record, and specifically the Union's exceptions to the decision of the Administrative Law Judge ("ALJ"), we conclude that the Union made sufficient objections to bring the "coercion" issue before the Board. The Union specifically objected to the ALJ's conclusion that:

> I find, therefore, that Respondent in essence has engaged in conduct violative of Section 8(b)(4)(ii)(B) of the Act by distributing the handbills as quoted above and printing them in the above-named publications, and that this conduct was not protected by the second proviso of Section 8(b)(4) of the Act.

T.R. 20:3 (Exception No. 10). The Union, therefore, objected specifically to the conclusions of the ALJ regarding two parts of the statutory scheme: the coercion issue and the publicity proviso issue.

In addition, the Union objected to the ALJ's conclusion that "[t]he mode of the

---

**5.** The NLRB also concluded that the consumer complaint and accident information in handbills "C" and "D" tended to be misleading, and then reasoned that these handbills did not truthfully advise the public within the meaning of

the publicity proviso. 263 N.L.R.B. at 999. We, however, need not decide this issue. The inclusion of the information unrelated to the primary dispute is enough to preclude protection of the publicity proviso.

publicity was deliberately chosen by Respondent and the reasonable highly coercive effect thereof perforce intended." T.R. 20:3 (Exception No. 8). This objection clearly pertains to the ALJ's findings in the last part of his opinion on the statutory issue of coercion. The Union also objected to the ALJ's failure to find that "[t]he issue is whether the Union violated Section 8(b)(4)(ii)(B) of the Act." T.R. 20:4 (Exception No. 14). The ALJ in the first part of the opinion framed the issues in such a way as to include only the publicity proviso and truthfulness issues. *See* T.R. 19:2 (ALJ decision). Understood in its literal sense, this objection attempted to include the coercion issue.

The NLRB and Delta argue that these exceptions were not sufficiently specific to constitute adequate notice. *See NLRB v. Seven-Up Bottling Co.*, 344 U.S. 344, 350, 73 S.Ct. 287, 290, 97 L.Ed. 377 (1953); *NLRB v. McCloskey & Co.*, 255 F.2d 68, 72 (3d Cir.1957). They also point out that the Union did not dispute the finding of "coercion" by the ALJ either in its brief for the Board, *see* 263 N.L.R.B. at 997, or in its original brief submitted to this court. Although we may disagree with the Union's litigation strategy, we cannot say that these exceptions, for the purpose of section 10(e), did not preserve this statutory issue for appeal.

A generalized objection to "each and every" finding or conclusion of an ALJ obviously lacks the necessary particularity. *Marshall Field & Co. v. NLRB*, 318 U.S. 253, 255, 63 S.Ct. 585, 586, 87 L.Ed. 744 (1943); *Consolidated Freightways v. NLRB*, 669 F.2d 790, 793 (D.C.Cir.1981). The exceptions here, however, were not generalized objections. The Union extracted the specific portions of the ALJ's decision to which it objected and quoted those

parts specifically. Both the Supreme Court and this court have held similar exceptions to be sufficient to preserve the issue for review. *See May Department Stores Co. v. NLRB*, 326 U.S. 376, 386 n. 5, 66 S.Ct. 203, 209 n. 5, 90 L.Ed. 145 (1945); *NLRB v. Southwest Security Equipment Corp.*, 736 F.2d 1332 (9th Cir.1984); *see also NLRB v. Spiewak*, 179 F.2d 695, 701 (3d Cir.1950) (en banc).

Our examination of the legislative purpose of section 10(e) also persuades us that the concerns of the statute are satisfied here. This section furthers "the salutary policy ... of affording the Board opportunity to consider on the merits questions to be urged upon review of its order." *Marshall Field & Co.*, 318 U.S. at 256, 63 S.Ct. at 586; *Consolidated Freightways*, 669 F.2d at 793. The exceptions, quoted above, were sufficiently specific to put the Board on notice that the statutory question of "coercion" was an issue. The Board discussed, although briefly,[6] the merits of this issue in its decision. *C.f. Washington Assoc. for Television & Children v. FCC*, 712 F.2d 677, 682 (D.C.Cir.1983) (court may find exhaustion of administrative remedies even if proponent party did not raise issue before administrative agency if agency considered issue). Unlike *Woelke*, in which neither the General Counsel nor the respondent made exceptions or even raised the issue, 456 U.S. at 665, 102 S.Ct. at 2082, in this case the Union excepted to the ALJ's decision on that issue. The Board, moreover, fully briefed the issue before we even requested supplemental briefs. These circumstances strongly suggest that the Board had the opportunity "to bring its labor relations expertise to bear on the problem." *NLRB v. Allied Products Corp., Richard Bros. Div.*, 548 F.2d 644, 653 (6th Cir.1977).[7]

---

**6.** We note, however, that Member Jenkins, who concurred in part and dissented in part, fully discussed the coercion issue with respect to the publication of the handbills in the Union's newspapers. *See* 263 N.L.R.B. at 1004.

**7.** The Union argues that the Supreme Court's recent pronouncement of its decision in *Edward J. DeBartolo Corp. v. NLRB*, 463 U.S. 147, 103

S.Ct. 2926, 77 L.Ed.2d 535 (1983), constitutes an "extraordinary circumstance" under section 10(e). *DeBartolo*, however, did not change the law of "coercion"; the Supreme Court merely remanded the case for resolution of this issue in the lower court. *Id.* at 2933; *see Stephens Institute v. NLRB*, 620 F.2d 720, 727 (9th Cir.), *cert.*

## IV.

█ Having accepted jurisdiction to review the statutory "coercion" issue, we nevertheless decline to exercise this jurisdiction here. Our reading of the NLRB decision raises several questions about the Board's resolution of the coercion issue. Specifically, we are unclear as to what standard the Board used when it found that the Union coerced Delta.

The NLRB majority initially stated that the Union's handbilling and advertisements had coerced Delta within the meaning of section 8(b)(4) because they "were designed to bring economic pressure on Delta" for a secondary object. 263 N.L.R.B. at 997. This understanding of what constitutes "coercion" is in effect an intent standard. The statutory requirement is satisfied because the Union's campaign was designed to coerce Delta.

Later in the opinion, however, the Board seemingly adopted a different test for coercion. The Board majority stated, "Under Sec. 8(b)(4)(ii)(B), a union engages in coercion when it imposes economic pressure against a secondary employer that is designed to inflict injury on the secondary employer's business." *Id.* at 999 n. 14. The Board then concluded that Delta had done so. Under this test, a union is guilty of "coercion" if 1) the union imposes economic pressure against a secondary employer, and 2) the pressure was designed to inflict injury. This, in effect, is an "effects" test because to prove coercion, evidence must be produced showing actual economic pressure, and perhaps even injury.

In the context of the facts of this case, however, the Board's finding of coercion is surprising because it did not know whether the Union had "impose[d] economic pressure" on Delta. The parties produced no evidence on this issue at the hearing before the ALJ. Moreover, the Board did not require any such evidence.

A third formulation, or perhaps a reformulation of the other two, can be found in

the Board's explanation of why the newspaper advertisements were "coercive". The Board reasoned that the advertisements were "coercive" because they were "part of" the Union's effort to institute a secondary boycott and their effect was "to enmesh Delta in the primary dispute ...." *Id.*

From the Board's cursory treatment of the "coercion" issue and the resulting ambiguity, it is difficult to surmise whether the handbilling and advertisements in this case fit within the Supreme Court's definition of "coercion" in, for example, *NLRB v. Retail Store Employees,* 447 U.S. 607, 616, 100 S.Ct. 2372, 2378, 65 L.Ed.2d 377 (1980). Coercion there was defined as that which "predictably encourages consumers to boycott a secondary business," *Id.* at 616, 100 S.Ct. at 2378, or that which "reasonably can be expected to threaten neutral parties with ruin or substantial loss ...," *id.* at 614, 100 S.Ct. at 2377. We will not resolve this ambiguity in the NLRB's decision by substituting the Board counsel's rationale for that of the Board. *See NLRB v. Food Store Employees' Union,* 417 U.S. 1, 9, 94 S.Ct. 2074, 2079, 40 L.Ed.2d 612 (1974).

## V.

█ We also decline to examine the constitutional issues raised on appeal. We are guided by the prudential rule that constitutional issues should be addressed only when strictly necessary. *See Minnick v. California Department of Corrections,* 452 U.S. 105, 122–23, 101 S.Ct. 2211, 2220–21, 68 L.Ed.2d 706 (1981); *Rescue Army v. Municipal Court,* 331 U.S. 549, 569 & n. 33, 570 n. 34, 67 S.Ct. 1409, 1419 & n. 33, 1420 n. 34, 91 L.Ed. 1666 (1947); *Taylor v. United States,* 320 F.2d 843, 846 (9th Cir. 1963), *cert. denied,* 376 U.S. 916, 84 S.Ct. 671, 11 L.Ed.2d 612 (1964). Here, we must address the preliminary statutory issue first, and our resolution of this issue must wait until the NLRB clarifies its decision on remand.

*denied,* 449 U.S. 953, 101 S.Ct. 358, 66 L.Ed.2d 217 (1980).

■ We note that the constitutional issues presented here are both novel and complex. *See NLRB v. Retail Store Employees,* 447 U.S. 607, 616, 100 S.Ct. 2372, 2378, 65 L.Ed.2d 377 (1980) (Blackmun, J., concurring); *id.* at 618, 100 S.Ct. at 2379 (Stevens, J., concurring); *NLRB v. Fruit & Vegetable Packers (Tree Fruits),* 377 U.S. 58, 63, 84 S.Ct. 1063, 1066, 12 L.Ed.2d 129 (1964). Unlike *Tree Fruits* and *Retail Store Employees,* however, which involved picketing, the issue here involves the use of handbills. *See Organization for a Better Austin v. Keefe,* 402 U.S. 415, 419, 91 S.Ct. 1575, 1577, 29 L.Ed.2d 1 (1971). The constitutionality of a restriction on handbills is more suspect than a restraint on picketing because "picketing involves elements of conduct as well as the communication of ideas." *Miller v. United Food & Commercial Workers Union,* 708 F.2d 467, 471 (9th Cir.1983); *see Retail Store Employees,* 447 U.S. at 619, 100 S.Ct. at 2379 (Stevens, J., concurring); *Bakery Drivers Local 802 v. Wohl,* 315 U.S. 769, 776, 62 S.Ct. 816, 819, 86 L.Ed. 1178 (1942) (Douglas, J., concurring); *NLRB v. International Association of Machinists,* 263 F.2d 796, 799–800 (9th Cir. 1959), *cert. denied,* 362 U.S. 940, 80 S.Ct. 803, 4 L.Ed.2d 769 (1960).[8] We also note that the application of section 8(b)(4) to the

facts of this case may infringe on other constitutional guarantees, the freedom of press and the freedom of association. *See generally Mills v. Alabama,* 384 U.S. 214, 219, 86 S.Ct. 1434, 1437, 16 L.Ed.2d 484 (1966); *New York Times Co. v. Sullivan,* 376 U.S. 254, 266, 84 S.Ct. 710, 718, 11 L.Ed.2d 686 (1964); *NAACP v. Alabama ex rel. Patterson,* 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958); *Lovell v. City of Griffin,* 303 U.S. 444, 452, 58 S.Ct. 666, 669, 82 L.Ed. 949 (1938). We think it proper to grapple with these difficult constitutional issues, if necessary, only after the statutory coercion issue is resolved.

## VI.

We therefore remand the statutory coercion issue to the NLRB for clarification, final resolution, and further hearings if necessary. "This case does not present the exceptional situation in which crystal-clear Board error renders a remand an unnecessary formality." *NLRB v. Food Store Employees' Union,* 417 U.S. at 8, 94 S.Ct. at 2079. Instead, a remand allows the Board to cast its expertise on the full and complete resolution of this important statutory question. *See Retail Store Employ-*

---

**8.** Whether the NLRB attempts to restrain the distribution of handbills or the publication of newspapers, the regulation of "coercive" publicity in section 8(b)(4) is clearly content-based. We have neither a case in which handbilling is prohibited because the handbillers are asking others to do something unlawful nor a case in which all handbilling is, for reasons of public order, banned. Instead, we have a case in which handbilling, otherwise lawful, is prohibited only when the handbillers express particular views, specifically, when they express views that are unrelated to the primary dispute. *Tree Fruits,* 377 U.S. at 79, 84 S.Ct. at 1074 (Black, J., concurring); *see Carey v. Brown,* 447 U.S. 455, 460–61, 100 S.Ct. 2286, 2289–91, 65 L.Ed.2d 263 (1980); *Retail Store Employees,* 447 U.S. at 618, 100 S.Ct. at 2379 (Stevens, J., concurring). This makes the restriction one intended to control the content of speech.

Because the regulation of the handbills and newspaper advertisements is content-based, the NLRB must demonstrate that the regulation "is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *Perry Education Association v. Perry Local Educators' Association,* 460 U.S. 37, 45, 103 S.Ct.

948, 955, 74 L.Ed.2d 794 (1983); *Carey v. Brown,* 447 U.S. at 461–62, 100 S.Ct. at 2290–91; *Police Department v. Mosley,* 408 U.S. 92, 101 & n. 8, 92 S.Ct. 2286, 2293 & n. 8, 33 L.Ed.2d 212 (1972).

The NLRB's counsel contends that the Board's application of section 8(b)(4) is constitutional because it only incidentally affects the Union's right to publicize the consumer complaint and accident information. Respondent draws this "incidental restriction" test from a line of commercial speech cases. *See Central Hudson Gas & Electric Corp. v. Public Service Commission,* 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980). The Union's handbills and advertisements, however, may not fit within the definition of "commercial speech" developed by the Supreme Court. The issue of whether they are either "expression related *solely* to the economic interests of the speaker and its audience" or "speech proposing a commercial transaction," *id.* at 561–62, 100 S.Ct. at 2349 (emphasis added), presents difficult questions of interpretation, which we need not resolve now. *See New York Times Co. v. Sullivan,* 376 U.S. 254, 266, 84 S.Ct. 710, 718, 11 L.Ed.2d 686 (1964); J. Nowak, Constitutional Law 940 (1983).

*ees,* 447 U.S. at 615 n. 11, 100 S.Ct. at 2378 n. 11. Furthermore, a remand gives proper deference to the Board as the steward of the nation's labor laws. *See Food Store Employees' Union,* 417 U.S. at 10, 94 S.Ct. at 2080.

 On remand, the Board may presume the constitutionality of the Act, as it did so in its proceedings. 263 N.L.R.B. at 999. Nevertheless, this does not mean that the Board should ignore the constitutional concerns. If the statutory definition of what constitutes coercion is legitimately open to more than one interpretation, the Board should choose the interpretation that does not create constitutional problems. *See NLRB v. Catholic Bishop,* 440 U.S. 490, 500–01, 99 S.Ct. 1313, 1318–19, 59 L.Ed.2d 533 (1979); *NLRB v. Fruit & Vegetable Packers (Tree Fruits),* 377 U.S. 58, 63, 84 S.Ct. 1063, 1066, 12 L.Ed.2d 129 (1964).[9] The NLRB has adopted this wise and prudent approach in past cases. *See Bekins Moving & Storage Co.,* 211 N.L.R.B. 138, 139 (1974) (mandatory language of Act must be construed in harmony with constitutional requirements); *American Federation of Television & Radio Artists, Local 55,* 150 N.L.R.B. 467, 472 n. 14 (1964) (Board's interpretation of publicity proviso recognized propriety of avoiding constitutional problems).[10] Of course, this rule "serves only to authorize the construction of a statute in a manner that is 'fairly possible.'" *Edward J. DeBartolo Corp. v. NLRB,* 463 U.S. 147, 103 S.Ct. 2926, 2933, 77 L.Ed.2d 535 (1983).

We note, however, that not all secondary activity necessarily constitutes coercive activity within the meaning of section 8(b)(4). *See NLRB v. Fruit & Vegetable Packers, (Tree Fruits),* 377 U.S. at 71–72, 84 S.Ct. at

1070–1071. As discussed above, the Supreme Court and this court have recognized the distinct difference between handbilling and picketing. The secondary activity here, therefore, may be subject to a different test for coercion than those employed by the courts and the Board in picketing cases.[11] On remand, the Board should specifically address the issue of what constitutes coercion in the context of the handbilling in this case.

We therefore affirm the Board's holding on the publicity proviso. We must nevertheless set aside the Board's order and remand for further proceedings consistent with this opinion.

---

**9.** We note that this rule does not apply to our interpretation of the publicity proviso because handbills "A" and "B" and the advertisement, reprinting handbill "A", clearly are not within the proviso's scope. Thus, an interpretation that protects only handbills "C" and "D" would not avoid the constitutional problems.

**10.** In *Great Western Broadcasting Corp. v. NLRB,* 310 F.2d 591 (9th Cir.1962), this court remanded the case to the Board to consider the statutory meaning of coercion. We also direct-

ed the Board to determine the merits of the intervenors' first amendment argument. *Id.* at 600; *see also Solien v. United Steelworkers,* 593 F.2d 82, 88 n. 3 (8th Cir.), *cert. denied,* 444 U.S. 828, 100 S.Ct. 54, 62 L.Ed.2d 36 (1979).

**11.** *See* Comment, 67 Minn.L.Rev. 1235 (1983); *see also* Jones, *Picketing and Coercion: A Jurisprudence of Epithets,* 39 Va.L.Rev. 1023 (1953); Note, 81 Mich.L.Rev. 1817 (1983).