# EDWARD J. DeBARTOLO CORP. *v.* NATIONAL LABOR RELATIONS BOARD ET AL.

No. 81–1985.   Argued March 22, 1983—Decided June 24, 1983

*Lawrence M. Cohen* argued the cause for petitioner. With him on the briefs were *W. Reynolds Allen* and *Mark E. Levitt.*

*Norton J. Come* argued the cause for respondents. With him on the brief for respondent National Labor Relations Board were *Solicitor General Lee, Linda Sher,* and *Elinor Hadley Stillman. Richard H. Frank, Laurence J. Cohen, Laurence Gold,* and *George Kaufmann* filed a brief for respondent Florida Gulf Coast Building Trades Council, AFL–CIO.*

JUSTICE STEVENS delivered the opinion of the court.

As a result of a labor dispute between respondent union and the H. J. High Construction Company (High), the union passed out handbills urging consumers not to trade with a group of employers who had no business relationship of any kind with High. The question presented is whether that handbilling is exempted from the prohibition against second-

---

*Briefs of *amici curiae* urging reversal were filed by *Stephen A. Bokat* for the Chamber of Commerce of the United States; by *Harry L. Browne* for the American Retail Federation; by *G. Brockwel Heylin* for the Associated General Contractors of America, Inc.; and by *Edward J. Sack* for the International Council of Shopping Centers, Inc.

ary boycotts contained in § 8(b)(4)[1] of the National Labor Relations Act, as amended, 29 U. S. C. § 158(b)(4), by what is known as the "publicity proviso" to that section.[2]

High is a general building contractor retained by the H. J. Wilson Company (Wilson) to construct a department store in a shopping center in Tampa, Fla. Petitioner, the Edward J. DeBartolo Corporation (DeBartolo), owns and operates the center. Most of the 85 tenants in the mall signed a standard lease with DeBartolo providing for a minimum rent (which increases whenever a large new department store opens for business) plus a percentage of gross sales, and requiring the tenant to pay a proportionate share of the costs of maintaining the mall's common areas, to pay dues to a merchants' association, and to take part in four joint advertising brochures. Wilson signed a slightly different land lease agreement, but it also promised to pay dues to the

---

[1] That section makes it an unfair labor practice for a labor organization or its agents

"(ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is:

. . . . .

"(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor or manufacturer, or to cease doing business with any other person . . . ." 61 Stat. 140, as amended, 29 U. S. C. § 158(b)(4).

[2] That proviso reads as follows:

"*Provided further*, That for the purposes of this paragraph (4) only, nothing contained in such paragraph shall be construed to prohibit publicity, other than picketing, for the purpose of truthfully advising the public, including consumers and members of a labor organization, that a product or products are produced by an employer with whom the labor organization has a primary dispute and are distributed by another employer, as long as such publicity does not have an effect of inducing any individual employed by any person other than the primary employer in the course of his employment to refuse to pick up, deliver, or transport any goods, or not to perform any services, at the establishment of the employer engaged in such distribution." 73 Stat. 543, 29 U. S. C. § 158(b)(4).

merchants' association and to share in the costs of maintaining the common areas. Under the terms of Wilson's lease, neither DeBartolo nor any of the other tenants had any right to control the manner in which High discharged its contractual obligation to Wilson.

The union conducted its handbilling at all four entrances to the shopping center for about three weeks, while the new Wilson store was under construction. Without identifying High by name, the handbill stated that the contractors building Wilson's Department Store were paying substandard wages, and asked the readers not to patronize any of the stores in the mall until DeBartolo publicly promised that all construction at the mall would be done by contractors who pay their employees fair wages and fringe benefits.[3] The

---

[3] The handbills read:

"PLEASE *DON'T SHOP AT EAST LAKE SQUARE MALL* PLEASE

"The FLA. GULF COAST BUILDING TRADES COUNCIL, AFL–CIO is requesting that you do not shop at the stores in the East Lake Square Mall because of The Mall ownership's contribution to substandard wages.

"The Wilson's Department Store under construction on these premises is being built by contractors who pay substandard wages and fringe benefits. In the past, the Mall's owner, The Edward J. DeBartolo Corporation, has supported labor and our local economy by insuring that the Mall and its stores be built by contractors who pay fair wages and fringe benefits. Now, however, and for no apparent reason, the Mall owners have taken a giant step backwards by permitting our standards to be torn down. The payment of substandard wages not only diminishes the working person's ability to purchase with earned, rather than borrowed, dollars, but it also undercuts the wage standard of the entire community. Since low construction wages at this time of inflation means decreased purchasing power, do the owners of East Lake Mall intend to compensate for the decreased purchasing power of workers of the community by encouraging the stores in East Lake Mall to cut their prices and lower their profits? "CUT-RATE WAGES ARE NOT FAIR UNLESS MERCHANDISE PRICES ARE ALSO CUT-RATE.

"We ask for your support in our protest against substandard wages. Please do not patronize the stores in the East Lake Square Mall until the Mall's owner publicly promises that all construction at the Mall will be done using contractors who pay their employees fair wages and fringe benefits.

handbilling was conducted in an orderly manner, and was not accompanied by any picketing or patrolling. DeBartolo advised the union that it would not oppose this handbilling if the union modified its message to make clear that the dispute did not involve DeBartolo or any of Wilson's cotenants, and if it limited its activities to the immediate vicinity of Wilson's. When the union persisted in distributing handbills to all patrons of the shopping center, DeBartolo filed a trespass action in the state court and an unfair labor practice charge with the National Labor Relations Board. The Board's General Counsel issued a complaint.

The complaint recited the dispute between the union and High, and noted the absence of any labor dispute between the union and DeBartolo, Wilson, or any of the other tenants of the East Lake Mall. The complaint then alleged that in furtherance of its primary dispute with High, the union "has threatened, coerced or restrained, and is threatening, coercing or restraining, various tenant Employers who are engaged in business at East Lake Square Mall, and who lease space from DeBartolo in East Lake Square Mall, by handbilling the general public not to do business with the above-described tenant Employers . . . ." Complaint ¶ 8(a). The complaint alleged that the object of the handbilling "was and is, to force or require the aforesaid tenant Employers in East Lake Square Mall . . . to cease using, handling, transporting, or otherwise dealing in products and/or services of, and to cease doing business with DeBartolo, in order to force DeBartolo and/or Wilson's not to do business with High." Complaint ¶ 8(b).

After the union filed its answer, the parties stipulated to the relevant facts and submitted the matter to the Board for

---

"IF YOU MUST ENTER THE MALL TO DO BUSINESS, please express to the store managers your concern over substandard wages and your support of our efforts.

"We are appealing only to the public—the consumer. We are not seeking to induce any person to cease work or to refuse to make deliveries."

decision. Without deciding whether the handbilling constituted a form of "coercion" or "restraint" proscribed by § 8(b)(4), the Board concluded that it was exempted from the Act by the "publicity proviso" and dismissed the complaint. *Florida Gulf Coast Building Trades Council, AFL–CIO (Edward J. DeBartolo Corp.)*, 252 N. L. R. B. 702 (1980). The Board reasoned that there was a "symbiotic" relationship between DeBartolo and its tenants, including Wilson, and that they all would derive a substantial benefit from the "product" that High was constructing, namely Wilson's new store. The Board did not expressly state that DeBartolo and the other tenants could be said to be distributors of that product, but concluded that High's status as a producer brought a total consumer boycott of the shopping center within the publicity proviso.[4]

The Court of Appeals agreed. 662 F. 2d 264 (CA4 1981). It observed that our decision in *NLRB* v. *Servette, Inc.*, 377 U. S. 46 (1964), had rejected a narrow reading of the proviso and that the Board had consistently construed it in an expansive manner. Finding the Board's interpretation consistent with the rationale of the National Labor Relations Act, it

---

[4] The Board concluded:

"In sum, we find that the mutual obligations between the parties and the benefits derived from participation in the mall enterprise reflect the symbiotic nature of the relationship between DeBartolo and its tenants, not unlike the relationship between the operations of a diversified corporation. High's contribution to this enterprise is as an employer which applies its labor to a product, i. e., the Wilson's store, from which DeBartolo and its tenants will derive substantial benefit. Consequently, we find as a result of its relationship with Wilson's and the shopping center enterprise that High applies capital, enterprise, and service to that enterprise, and thus that it is a 'producer' in the sense that that term is used in the publicity proviso as interpreted by the Supreme Court in *Servette*, [377 U. S. 46 (1964)], and by this Board in *Pet*, [244 N. L. R. B. 96 (1979)].

"Having found High to be a producer within the meaning of Section 8(b)(4), we find that Respondent's handbilling urging a total consumer boycott of DeBartolo and its tenants other than Wilson's is protected by the publicity proviso of that section of the Act." 252 N. L. R. B., at 705.

held that High was a producer and that DeBartolo and the other tenants were distributors within the meaning of the proviso. This holding reflected the court's belief that in response to the union's consumer handbilling, DeBartolo and the storekeepers would be able "in turn, to apply pressure on Wilson's and High." 662 F. 2d, at 271. Because the decision conflicts with that of the Court of Appeals for the Eighth Circuit in *Pet, Inc.* v. *NLRB*, 641 F. 2d 545 (1981), we granted certiorari. 459 U. S. 904 (1982).[5]

The Board and the union correctly point out that DeBartolo cannot obtain relief in this proceeding unless it prevails on three separate issues. It must prove that the union did "threaten, coerce, or restrain" a person engaged in commerce, with the object of "forcing or requiring" someone to cease doing business with someone else—that is to say, it must prove a violation of § 8(b)(4)(ii)(B). It must also overcome both the union's defense based on the publicity proviso and the union's claim that its conduct was protected by the First Amendment. Neither the Board nor the Court of Appeals considered whether the handbilling in this case was covered by § 8(b)(4)(ii)(B) or protected by the First Amendment, because both found that it fell within the proviso. We therefore limit our attention to that issue.

The publicity proviso applies to communications "other than picketing," that are "truthful," and that do not produce either an interference with deliveries or a work stoppage by employees of any person other than the firm engaged in the

---

[5] DeBartolo was successful in its trespass action in the state court. The handbilling at the East Lake Mall was enjoined and ceased on January 4, 1980. The parties agree, however, that the case is not moot. DeBartolo operates a number of shopping centers at various locations throughout the United States, and the union maintains that it has a right to engage in comparable handbilling in the future if a similar problem should again arise. That possibility, together with the fact that a cease-and-desist order would protect DeBartolo from a recurrence in the future, provides a sufficient basis for concluding that the case is not moot.

primary labor dispute. The Board and the Court of Appeals found that these three conditions were met, and these findings are not now challenged. The only question is whether the handbilling "advis[ed] the public . . . that a product or products are produced by an employer with whom the labor organization has a primary dispute and are distributed by another employer." The parties agree that this language limits the proviso's protection to publicity that is designed to create consumer pressure on secondary employers who distribute the primary employer's products. They do not agree, however, on what constitutes a producer-distributor relationship.

We have analyzed the producer-distributor requirement in only one case, *NLRB* v. *Servette, Inc.*, *supra*. *Servette* involved a primary dispute between a union and a wholesale distributor of candy and certain other specialty items sold to the public by supermarkets. The union passed out handbills in front of some of the chainstores urging consumers not to buy any products purchased by the store from Servette. We held that even though Servette did not actually manufacture the items that it distributed, it should still be regarded as a "producer" within the meaning of the proviso. We thus concluded that the handbills advised the public that the products were produced by an employer with whom the union had a primary dispute (Servette) and were being distributed by another employer (the supermarket).

In reaching that conclusion, we looked to the legislative history of the Labor-Management Reporting and Disclosure Act of 1959, Pub. L. 86–257, 73 Stat. 519, which had simultaneously strengthened the secondary boycott prohibition and added the publicity proviso. We noted that a principal source of congressional concern had been the secondary boycott activities of the Teamsters Union, which for the most part represented employees of motor carriers who did not "produce" goods in the technical sense of the verb. The Teamsters' activities were plainly intended to be cov-

ered by the new prohibitions in §8(b)(4)(ii)(B), and we declined to hold that Congress, in using the word "produced," had intended to exclude the Teamsters entirely from the offsetting protections of the proviso. "There is nothing in the legislative history which suggests that the protection of the proviso was intended to be any narrower in coverage than the prohibition to which it is an exception, and we see no basis for attributing such an incongruous purpose to Congress." 377 U. S., at 55.

The focus of the analysis in *Servette* was on the meaning of the term "producer." In this case, DeBartolo is willing to concede that Wilson distributes products that are "produced" by High within the meaning of the statute. This would mean that construction workers, like truckdrivers, may perform services that are essential to the production and distribution of consumer goods. We may therefore assume in this case that High, the primary employer, is a producer within the meaning of the proviso.[6] Indeed, we may assume here that the proviso's "coverage"—the types of primary disputes it allows to be publicized—is broad enough to include almost any primary dispute that might result in prohibited secondary activity.[7]

We reject, however, the Board's interpretation of the extent of the secondary activity that the proviso permits. The only publicity exempted from the prohibition is publicity intended to inform the public that the primary employer's product is "distributed by" the secondary employer. We are persuaded that Congress included that requirement to reflect

---

[6] Cf. *Local 712, IBEW (Golden Dawn Foods)*, 134 N. L. R. B. 812 (1961) (electrical and refrigeration work); *Plumbers & Pipefitters, Local 142 (Shop-Rite Foods)*, 133 N. L. R. B. 307 (1961) (refrigeration work).

[7] As the Board stated in *International Brotherhood of Teamsters, Local 537 (Lohman Sales Co.)*, 132 N. L. R. B. 901, 907 (1961), "there is no suggestion either in the statute itself or in the legislative history that Congress intended the words 'product' and 'produced' to be words of special limitation."

the concern that motivates all of § 8(b)(4): "shielding unoffending employers and others from pressures in controversies not their own." *NLRB* v. *Denver Building & Construction Trades Council*, 341 U. S. 675, 692 (1951).[8] In this case, the Board did not find that any product produced by High was being distributed by DeBartolo or any of Wilson's cotenants. Instead, it relied on the theory that there was a symbiotic relationship between them and Wilson, and that DeBartolo and Wilson's cotenants would derive substantial benefit from High's work. That form of analysis would almost strip the distribution requirement of its limiting effect. It diverts the inquiry away from the relationship between the primary and secondary employers and toward the relationship between two secondary employers. It then tests that relationship by a standard so generous that it will be satisfied by virtually any secondary employer that a union might want consumers to boycott. Yet if Congress had intended all peaceful, truthful handbilling that informs the public of a primary dispute to fall within the proviso, the statute would not have contained a distribution requirement.[9]

In this case, DeBartolo is willing to assume that Wilson distributes products that are "produced" by High within the meaning of the statute. Wilson contracted with High to receive the construction services that are the subject of the primary dispute, and the cost of those services will presumably be reflected in the prices of the products sold by Wilson. But the handbills at issue in this case did not merely call for a boycott of Wilson's products; they also called for a boycott

---

[8] See also *Longshoremen* v. *Allied International, Inc.*, 456 U. S. 212, 223 (1982); *Carpenters* v. *NLRB*, 357 U. S. 93, 100 (1958); H. R. Rep. No. 245, 80th Cong., 1st Sess., 24 (1947), 1 NLRB, Legislative History of the Labor Management Relations Act of 1947, p. 315 (1948).

[9] The Board concedes in its brief that Congress intended this language to restrict the scope of the proviso. It acknowledges that the product must be "in some manner distributed by the employers at whose customers the nonpicketing publicity is immediately directed." Brief for Respondent NLRB 9.

of the products being sold by Wilson's cotenants. Neither DeBartolo nor any of the cotenants has any business relationship with High. Nor do they sell any products whose chain of production can reasonably be said to include High. Since there is no justification for treating the products that the cotenants distribute to the public as products produced by High, the Board erred in concluding that the handbills came within the protection of the publicity proviso.

Stressing the fact that this case arises out of an entirely peaceful and orderly distribution of a written message, rather than picketing, the union argues that its handbilling is a form of speech protected by the First Amendment. The Board, without completely endorsing the union's constitutional argument, contends that it has sufficient force to invoke the Court's prudential policy of construing Acts of Congress so as to avoid the unnecessary decision of serious constitutional questions. See *NLRB* v. *Catholic Bishop of Chicago*, 440 U. S. 490, 500–501 (1979). That doctrine, however, serves only to authorize the construction of a statute in a manner that is "fairly possible." *Crowell* v. *Benson*, 285 U. S. 22, 62 (1932). We do not believe that the Board's expansive reading of the proviso meets that standard.[10]

Nevertheless, we do not reach the constitutional issue in this case. For, as we noted at the outset, the Board has not

---

[10] Concededly, "[t]he proviso was the outgrowth of a profound Senate concern that the unions' freedom to appeal to the public for support of their case be adequately safeguarded." *NLRB* v. *Servette, Inc.*, 377 U. S. 46, 55 (1964). Indeed, several legislators referred to the First Amendment explicitly during the debates. *E. g.*, 105 Cong. Rec. 6232 (1959), 2 NLRB, Legislative History of the Labor-Management Reporting and Disclosure Act of 1959, p. 1037 (1959) (Sen. Humphrey); 105 Cong. Rec., at 18135, 2 NLRB Legislative History, at 1722 (Rep. Udall). That fact, however, merely confirms in this case the presumption that underlies *Catholic Bishop* and *Crowell:* when Congress legislates in a fashion that restricts communicative activity, it expects the statutory language to be construed narrowly. See *Catholic Bishop*, 440 U. S., at 507. It does not, however, expect the statutory language to be deprived of substantial practical effect.

yet decided whether the handbilling in this case was pro-
scribed by the Act. It rested its decision entirely on the
publicity proviso and never considered whether, apart from
that proviso, the union's conduct fell within the terms of
§ 8(b)(4)(ii)(B).[11]  Until the statutory question is decided,
review of the constitutional issue is premature.

The judgment of the Court of Appeals is vacated, and the
case is remanded for further proceedings consistent with this
opinion.

*It is so ordered.*

---

[11] Cf. *NLRB* v. *Retail Store Employees,* 447 U. S. 607 (1980) (picket line
advocating boycott of substantial portion of secondary employer's business
is proscribed); *NLRB* v. *Fruit Packers,* 377 U. S. 58 (1964) *("Tree Fruits")*
(picket line advocating boycott of insubstantial portion of secondary em-
ployer's business is not proscribed).