623 F.Supp. 597 (1985)
Joseph H. SOLIEN, Regional Director of Region 14 of the National Labor Relations Board, for and on Behalf of the NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
CARPENTERS DISTRICT COUNCIL OF GREATER ST. LOUIS, AFL-CIO, Respondent.
No. 85-2259C(1).
United States District Court, E.D. Missouri, E.D.
December 19, 1985.
*598 Keltner W. Locke, N.L.R.B., Region 14, St. Louis, Mo., for petitioner.
Morris J. Levin, St. Louis, Mo., for respondent.

MEMORANDUM
NANGLE, Chief Judge.
This matter is before the Court on the petition of the Regional Director of the National Labor Relations Board (the Board) for an injunction under Section 10(1) of the National Labor Relations Act, 29 U.S.C. § 160(1) (1982) (NLRA). The Board seeks an injunction pending final disposition of these matters by the Board. The Board alleges that handbilling conducted by the Carpenters District Council of Greater St. Louis, AFL-CIO (the union) violates Section 8(b)(4) of the NLRA, 29 U.S.C. § 158(b)(4) (1982).
On October 1, 1985, a hearing was held before this Court. Having considered the pleadings, the testimony of the witnesses, the documents in evidence, and the stipulations of the parties, and being fully advised in the premises, this Court makes the following findings of fact and conclusions of law.

FINDINGS OF FACT
1. Sometime after October 5, 1984, the union distributed a leaflet at the Port *599 Apartments, located at Baumgartner and Telegraph Roads in St. Louis County, Missouri. These apartments were being constructed by Barnett Range and various subcontractors in its employ. The leaflet mentions an Oklahoma construction company doing "carpenter framing". The parties agree this reference is to Rinker and Yocham Construction.
2. On or about October 9, 1984, Barnett Range filed with the St. Louis Regional Office of the National Labor Relations Board a charge against the union for violation of Section 8(b)(4) of the NLRA, 29 U.S.C. § 158(b)(4). This charge pertained to the union's conduct at the Port Apartments.
3. On October 12, 1984, the St. Louis Regional Office of the National Labor Relations Board sought an injunction under Section 10(1) of the NLRA, 29 U.S.C. § 160(1) alleging that the Board had reasonable cause to believe that the union had violated Section 8 of the Act.
4. On or about November 5, 1984, by an informal settlement agreement the union agreed not to picket the Port Apartments job site. The St. Louis Regional Director of the National Labor Relations Board approved this settlement on November 7, 1984.
5. On January 30, 1985, the Honorable Clyde S. Cahill, United States District Judge, dismissed the Board's petition for a temporary injunction in that matter.
6. Construction has been completed at the Port Apartments job site. Tenants now occupy some apartments, and Barnett Range seeks to rent the remaining apartments. Barnett Range owns and operates the Port Apartments.
7. On or about August 1, 1985, the union began distributing handbills to persons driving in and out of the Port Apartments complex. Individuals were given copies of the handbill which appears as Appendix 1 of this memorandum. As a result of the handbilling, some individuals have turned away without examining or leasing the apartments. Handbilling at the Port Apartments has continued every day since it began, except for Labor Day. This activity arises out of the union's dispute over wages paid by Rinker and Yocham.
8. On June 8, 1984, Barnett Range filed with the Department of Public Works of St. Louis County, Missouri its application for a building permit for construction of the Port Apartments. The application detailed the construction of the outer perimeter walls of the Port Apartments.
9. Section 1225.5 of the Building Code adopted by St. Louis County provides for the use of anchor bolts in certain construction.
10. By a letter dated October 12, 1984, the architect for Barnett Range sought authorization to use Hilty nails rather than anchor bolts. On October 15, 1984, St. Louis County authorized this modification.
11. On May 2, 1985, an architect for Barnett Range sought approval of another fastner, the Red Head No. 12884 anchor. On May 6, 1985, St. Louis County approved this modification.
12. By letter of May 6, 1985, an architect for Barnett Range notified St. Louis County that washers had not been installed along with the Red Head anchors and requested that St. Louis County approve the installation of the anchors without washers. On June 5, 1985, St. Louis County approved the anchors which had already been installed. St. Louis County has not brought suit against any party for violations of its building code as a result of the construction practices used at the Port Apartments. When each apartment was rented, St. Louis County issued occupancy permits and the county has never denied such a permit.
13. Rinker and Yocham left the Port Apartments project in mid-July, 1985 and began working for Barnett Range at another job site approximately 32 miles away.
14. On August 13, 1984, a meeting was attended by Russell Barnett, President of the Midwest Division of Barnett Range; Ollie W. Langhorst, Executive Secretary-Treasurer of the Carpenters' District Council *600 of Greater St. Louis; Morris J. Levin, attorney for the union; and Timothy L. Stalnaker, attorney for Barnett Range. At the meeting Russell Barnett discussed past problems with Rinker and Yocham and his company's intention to use Rinker and Yocham for framing or rough carpentry work. Barnett explained that though Rinker and Yocham would bring in Oklahoma workers and pay lower wages, Barnett Range would hire union carpenters for finish carpentry work.
15. Of the 35 subcontractors used by Barnett Range at the Port Apartments, 27 subcontractors had offices in Missouri and used Missouri, mostly St. Louis, employees.

CONCLUSIONS OF LAW
This Court has jurisdiction under Section 10(1) of the NLRA, 29 U.S.C. § 160(1). Respondent is a labor organization as defined by Sections 2(5), 8(b), and 10(1) of the NLRA.
In deciding whether to grant an injunction under Section 10(1), the court need not decide whether an unfair labor practice occurred, only whether there is reasonable cause to believe that an unfair practice occurred. To carry its burden, the Board must establish that the legal issues involved are substantial and non-frivolous. Hendrix v. International Union of Operating Engineers Local 571, 592 F.2d 437, 442 (8th Cir.1979). If the Court finds reasonable cause to believe that an unfair labor practice occurred, it must then determine whether equitable relief is just and proper. Injunctive relief is just and proper when the circumstances of the case create a reasonable apprehension that the remedial purposes of the statute will be frustrated in the absence of such relief. Wilson v. Milk Drivers and Dairy Employees Union Local 471, 491 F.2d 200, 203 (8th Cir. 1974) (citing Minnesota Mining & Manufacturing v. Meter, 385 F.2d 265, 272 (8th Cir.1967)).
To obtain equitable relief, the Board must prevail on three issues. First, the Board must establish a violation of Section 8  that is, that the union threatened, coerced, or restrained Barnett Range with the object of forcing or requiring Barnett Range to cease doing business with Rinker and Yocham. Second, the Board must overcome the union's defense based on the publicity proviso contained within Section 8(b). Third, the Board must adequately answer the union's claim of First Amendment protection.

I.
As the Board argues, the union's handbilling violates Section 8(b), because through the handbilling the union attempts to inflict economic harm on Barnett Range, a secondary employer. The union argues that peaceful and orderly distribution of handbills, which informed consumers of substandard wages and construction flaws, cannot be considered a violation of Section 8(b).[1]
Section 8(b) provides that it shall be an unfair labor practice for a labor organization or its agents to force or require any person to cease using or otherwise dealing in the products of any other producer or to cease doing business with any other person.[2]
*601 The statute does not prohibit all actions by unions at secondary employer sites. In NLRB v Fruit & Vegetable Packers Local 760, 377 U.S. 58, 84 S.Ct. 1063, 12 L.Ed.2d 129 (1964) (Tree Fruits), the union picketed outside a grocery store to persuade consumers not to purchase a product offered for sale by the store and produced by an employer with whom the union had a dispute. Finding no violation of the statute, the Supreme Court held that when consumer picketing is employed only to persuade customers not to buy the struck product, the union's appeal is closely confined to the primary dispute. The secondary employer's purchases from the struck firm are decreased only because the public has diminished its purchases of the struck product. In contrast, when a union pickets to persuade customers not to trade at all with the secondary employer, the latter stops buying the struck product, not because of a falling demand, but in response to pressure designed to inflict injury on its business generally. This pressure creates a separate dispute with the secondary employer, a result the statute seeks to avoid. 377 U.S. at 72, 84 S.Ct. at 1071.
The Tree Fruits doctrine has limited application in construction cases. Unlike the products at a grocery store, the work of a subcontractor merges with the work of the general contractor and developer. Consequently, publicity directed against a subcontractor embroils the general contractor and developer in the labor dispute.
In Hoffman v. Cement Masons Union Local 337, 468 F.2d 1187 (9th Cir.1972), cert. denied, 411 U.S. 986, 93 S.Ct. 2269, 36 L.Ed.2d 964 (1973), the Ninth Circuit granted the Board's petition for enforcement and held union picketing and handbilling designed to publicize the payment of substandard wages by the general contractor to be unlawful. Whitney, the general contractor and primary employer, built subdivision homes owned and sold by Shuler, the developer and secondary employer. These homes were Shuler's sole product at the site of the union's activity. The union's signs did not identify Whitney as the primary employer. The Ninth Circuit found the union's actions unprotected by the Tree Fruits doctrine. Since Shuler offered only one product at the site of the picketing, consumers who supported the union could respond only by refusing to transact any business whatsoever with Shuler. As a result, Shuler would cease doing business with Whitney. Though the court recognized the interests of the union in its dispute with the general contractor, the court found that the statute favored the interest of the secondary employer. When a union's interest in picketing a primary employer at a single product site conflicts with the need to protect neutral employers from the labor disputes of others, the interests of the neutral employer prevail. 468 F.2d at 1191. Similarly, in K & K Construction Company v. NLRB, 592 F.2d 1228 (3rd Cir.1979), the Third Circuit vacated an order of the Board upholding picketing at the sales office of a housing developer. Unlike Cement Masons, the signs used by the picketers clearly identified the union's dispute as one with the subcontractor and not the housing developer. Nevertheless, the Third Circuit found the Tree Fruits exception unavailable where the sole product of the secondary employer contains the product of the primary employer, the so-called merged product doctrine. When the consumer cannot separate the struck product from the secondary employer, courts find the union activity coercive toward the secondary employer. 592 F.2d at 1232. See C. Morris, The Developing Labor Law 1119-24 (2d Ed.1983); see also NLRB v. Retail Store Employees Local 1001, 447 U.S. 607, 100 S.Ct. 2372, 65 L.Ed.2d 377 (1979) (Safeco) (finding coercion where the struck product accounted for 90% of the secondary's business).
At the Port Apartments, Barnett Range sells only apartments on which Rinker and Yocham performed rough carpentry work. Therefore, consumers can respond to the union's handbills only by refusing to rent an apartment at the Barnett Range development. *602 If the union succeeds, Barnett Range will stop using Rinker and Yocham in response to pressure designed to inflict injury on the business of Barnett Range generally. Because consumers cannot separate the product of the primary and secondary employers, the union creates a separate dispute with Barnett Range, the secondary employer. Indeed, the facts indicate that the handbills succeeded in dissuading some customers from examining or leasing the apartments. See Findings of Fact No. 7. Moreover, during the handbilling Rinker and Yocham were working at another site miles away. See Findings of Fact No. 13. By handbilling at the Port Apartments, the union sought to force Barnett Range to stop using Rinker and Yocham on the other construction project. Thus, the union's activities violate § 8(b) unless protected by the publicity proviso of that section of the Act.

II.
The union argues that its activities are protected by the publicity proviso of Section 8(b). The Board denies that the union's activities fall within the exemption of the publicity proviso, because the handbills contain untruthful information, do not identify the dispute with the primary employer and the secondary employer's relationship to it, and contain information unrelated to the primary dispute.
The publicity proviso applies to communications, other than picketing, that are truthful and do not produce either an interference with deliveries or work stoppage by employees of any person other than the firm engaged in the primary labor dispute.[3]Edward J. Debartolo Corp. v. NLRB, 463 U.S. 147, 155, 103 S.Ct. 2926, 2932, 77 L.Ed.2d 535 (1983). Also, the publicity proviso requires that handbills advise the public that a product is produced by an employer with whom the labor organization has a primary dispute and is distributed by another employer. The parties do not dispute that the union's handbilling constitutes an activity other than picketing or that the handbilling did not interfere with deliveries or produce a work stoppage. Nor do they dispute that Rinker and Yocham produced a product distributed by Barnett Range.[4]
The publicity proviso protects only truthful information. This limitation requires the Court to inquire into the factual basis of the handbill's claims. A handbill is truthful so long as it does not substantially depart from fact or intend to deceive. *603 Central Industrial Building and Constructions Trades Council (K-Mart Corp.), 257 N.L.R.B. 86, 88, 107 L.R.R.M. 1463 (1981). The union need only establish a reasonable basis for the information contained in its handbills. See Allentown Racquet Ball & Health Club v. Building and Construction Trades Council of Lehigh, 525 F.Supp. 156, 162-63 (E.D.Pa. 1981) (unions which appeal to the public based upon an alleged violation of area standards must have a reasonable basis for believing that the standards are being violated).
The Board contends that the handbills contain at least several factual inaccuracies. First, as the handbill states, the Port Apartments were not built under full compliance with the county building codes. The Board attaches great importance to the fact that St. Louis County has not sued Barnett Range for violation of the building code and has issued occupancy permits for each of the apartments in the Port Apartments complex. See Findings of Fact No. 12. In addition, the Board submits that the use of Hilty nails and Red Heads fasteners, rather than anchor bolts, did not violate the building code, because the code permits building officials to approve alternative materials. See Findings of Fact Nos. 9, 10, 11 and 12. In response, the union argues that the construction did not comply with the requirements of the code, because construction workers failed to install a washer necessary when using Hilty nails. As the union argues, the county excused the use of washers by waiving the requirements of the code. In effect, the union argues, the county agreed to approve construction and not sue for violations even though the apartments did not meet the code. Second, the back of the handbill refers to a statement made by Hal Barnett at a meeting with union representatives. The testimony of Russell Barnett established that he, not Hal Barnett, attended the meeting to which the handbill refers. In the only evidence concerning that meeting, Russell Barnett denied making the statement quoted in the handbill. The Court credits his testimony. At the meeting, Barnett discussed past dissatisfaction with the work of Rinker and Yocham but denied any current problems. Barnett also discussed his desire for union carpenters to perform the finish carpentry work.[5]See Findings of Fact No. 14. Third, as the front of the handbill states, the contractor did not employ St. Louis construction workers but shipped in lower-paid, underskilled workers from Oklahoma. This statement, the Board contends, confuses the general contractor and neutral Barnett Range with the subcontractor Rinker and Yocham.
Regarding compliance with building code, the proper characterization of the actions of the County is a close question. This Court finds that the union has established a reasonable basis for believing that the apartments were not built in full compliance with the building code. Regarding the other alleged inaccuracies, this Court finds that the union has not satisfied the liberal reasonable basis standard. The union misquoted the statements made by Russell Barnett at the meeting.[6] First, Barnett denies making the statement attributed to him. Second, all parties to the meeting were familiar with the terminology used in the construction industry. They knew that in the context of their discussion "rough work" was not the equivalent of "sloppy work" but instead referred to the framing at the building. Thus, Barnett's request for union carpenters to cover rough work does not provide a reasonable basis for the quote in the handbill. Regarding the use of Missouri workers, the evidence establishes that Barnett Range used numerous Missouri construction workers. See Findings of Fact No. 15. Though the union may have intended the *604 "contractor" to refer to Rinker and Yocham, when considered in context the reference is misleading and deceptive to the point of being false.
In addition to containing false statements, the union's handbill fails to satisfy the publicity proviso on other grounds. The only publicity exempted from the prohibition of Section 8 is publicity intended to inform the public that the primary employer's product is distributed by the secondary employer. 463 U.S. at 155, 103 S.Ct. at 2932. The dispositive factor is the probable effect of the picketing upon the consumer. NLRB v. Twin City Carpenters District Council, 422 F.2d 309, 314 (8th Cir.1970); see Cement Masons, 468 F.2d at 1192. Furthermore, publicity must be exclusively for the purpose of truthfully advising the public. The Ninth Circuit has interpreted this phrase as strictly limiting publicity to that which advises the public of the nature of the dispute and the secondary employer's relationship to it. Hospital & Service Employees Union Local 399 v. NLRB, 743 F.2d 1417, 1422 (9th Cir.1984). If the handbill contains information unrelated to the primary dispute, the handbill falls outside the protection of the publicity proviso. 743 F.2d at 1424. This limitation applies regardless of whether the unrelated information is truthful or the handbills properly identify the primary dispute. Thus, to be covered by the proviso, the handbills must (1) identify the dispute with the primary employer and the secondary employer's relationship to it, and (2) not contain information unrelated to the primary dispute.
First, the front of the handbill does not name the contractor with whom the union has its dispute. The back of the handbill quotes Hal Barnett of Barnett Range as saying that his non-union carpenters are fast but do sloppy work and identifies Barnett Range as a contractor on an apartment project underway in South County. These statements could lead consumers to believe that Barnett Range was the primary employer in the union's dispute. Though the handbill notes that Rinker and Yocham intended to pay substandard wages, the handbill does not identify the relationship between Rinker and Yocham and Barnett Range. Therefore, the handbill fails to identify the dispute and the secondary's relationship to it.
Second, the front of the handbill, in words and pictures, informs consumers that anchor bolts were not used in the construction of the Port Apartments. The back of the handbill discusses the relative load carrying capacities of Hilty nails and anchor bolts and the requirements of the county building code. This material does not relate to the union's complaint over non-union wages. Therefore, the handbill contains information unrelated to the primary dispute, the substandard wages paid by Rinker and Yocham. Consequently, the publicity proviso does not exempt the union and its handbill from a violation of Section 8.

III.
The union raises the First Amendment in defense of its activities. The union poses the issue for decision as whether the First Amendment permits an absolute ban on non-picketing publicity to inform consumers of substandard construction wages. This misstates the issue. Here, the Court must decide a narrower question  whether applying Section 8(b)(4)(ii)(B) to the handbilling in this case violates the First Amendment. In particular, this Court must address whether the First Amendment protects a coercive handbill which contains untrue and misleading information. This Court concludes that it does not.
As the Supreme Court held in Safeco, Section 8(b)(4)(ii)(B) imposes permissible restrictions upon constitutionally protected speech when applied to publicity that predictably encourages consumers to boycott a secondary business. 447 U.S. at 616, 100 S.Ct. at 2378. This Court finds no reason to depart from that holding.
A number of factors persuade the Court to reach this conclusion. First, the union's handbills were directed toward a neutral *605 employer with an intent to force the neutral to cease business with the primary employer. Second, since the handbills turned away some consumers, the handbills achieved the proscribed objective of spreading the dispute to a neutral employer. Third, the handbill contained false and deceptive statements. Given these facts, this Court is reluctant to hold unconstitutional congress' striking of the delicate balance between union freedom of expression and the ability of neutral employers, employees, and consumers to remain free from coerced participation in industrial strife. See Safeco, 447 U.S. at 617-18, 100 S.Ct. at 2378-79 (Blackmun, J., concurring in judgment).[7]
For the above reasons, this Court enjoins continued distribution of this handbill by the union at the Port Apartments complex.

ORDER
Pursuant to the memorandum filed herein this day,
IT IS HEREBY ORDERED that the respondent, its officers, representatives, agents, servants, employees, attorneys, and all members and persons acting in concert or participation with them be and are enjoined from threatening, coercing, or restraining Barnett Range Corporation or any person engaged in commerce or in an industry affecting commerce by handbilling, picketing, orders, directions, instructions, requests, or appeals at or in the vicinity of the Port Apartments residential apartment complex of Barnett Range Corporation at 2514 Deloak Drive, St. Louis County, Missouri, where an object thereof is to force or to require Barnett Range Corporation to cease using, selling, handling, transporting, or otherwise working on the products of, or to cease doing business with, Oscar Rinker and Gary Yocham, doing business as Rinker and Yocham Construction, pending the final disposition of the matters involved herein by the National Labor Relations Board.
IT IS FURTHER ORDERED that respondent's motion to reopen the record be and is granted. The exhibits submitted with that motion are hereby admitted.

*606 APPENDIX I

*607 
NOTES
[1] The union argues that its handbilling is not secondary activity. As the union asserts, Barnett Range is not a neutral employer, because Barnett Range served as owner and general contractor of the Port Apartments. This Court disagrees. Essentially, the present activities continue the union's dispute of 1984. The union's dispute concerns the wages paid by Rinker and Yocham, not Barnett Range. Thus, Rinker and Yocham is the primary employer. Barnett Range, as the general contractor which hired Rinker and Yocham, is the secondary employer.
[2] Section 8(b)(4)(ii)(B) reads in pertinent part:

(b) It shall be an unfair labor practice for a labor organization or its agents ....
(4)(ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is 
. . . . .
(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer ...: Provided, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing; ....
[3] The publicity proviso reads in pertinent part: Provided, That nothing contained in this subsection shall be construed to make unlawful a refusal by any person to enter upon the premises of any employer (other than his own employer), if the employees of such employer are engaged in a strike ratified or approved by a representative of such employees whom such employer is required to recognize under this subchapter: Provided further, That for the purposes of this paragraph (4) only, nothing contained in such paragraph shall be construed to prohibit publicity, other than picketing, for the purpose of truthfully advising the public, including consumers and members of a labor organization, that a product or products are produced by an employer with whom the labor organization has a primary dispute and are distributed by another employer, as long as such publicity does not have an effect of inducing any individual employed by any person other than the primary employer in the course of his employment to refuse to pick up, deliver, or transport any goods, or not to perform any services, at the establishment of the employer engaged in such distribution; ....
[4] In Debartolo, Debartolo, a mall management company, conceded that Wilson, a mall department store, distributed products produced by High, a construction company. The court inferred that "construction workers, like truck drivers, may perform services essential to the production and distribution of consumer goods." 463 U.S. at 155, 103 S.Ct. at 2932. Here, the court presumes that the subcontractor, Rinker and Yocham, produces a product  rough carpentry work  distributed by the general contractor, Barnett Range. As the Supreme Court noted in Debartolo, the coverage of the proviso is broad enough to include almost any primary dispute that might result in prohibited secondary activity. 463 U.S. at 155, 103 S.Ct. at 2932. See International Brotherhood of Teamsters Local 537 (Lohman Sales Co.), 132 N.L. R.B. 901, 907 (1961) (congress did not intend the word `product' as a word of special limitation). Thus, regarding the production and distribution requirement of the publicity proviso, this Court finds the facts of this case fall within the requirements of the proviso.
[5] Rough and finish are construction terms of art referring, respectively, to the construction of the building frame and the work covering the frame.
[6] The Board presented no evidence that the misidentification of Russell Barnett was of any consequence. Therefore, the Court does not rely upon the misidentification in making its findings.
[7] Contrary to the union's concerns, this result does not constitute an absolute ban based upon the content of the handbills. First, the restriction upon union activity depends upon the location of distribution as well as the content of the handbills. Rinker and Yocham finished their work at the Port Apartments before handbilling began. Therefore, the sole object of the handbilling was to coerce a neutral employer. Second, if the handbilling is not coercive, its contents is limited only to the extent that the information must be true and relevant to the dispute. This limitation comports with the application of the First Amendment to speech pertaining to commercial transactions. Commercial speech that is not false or deceptive and does not concern unlawful activities may be restricted only in the service of a substantial governmental interest and through means that directly advance that interest. Zauderer v. Office of Disciplinary Council of the Supreme Court of Ohio, ___ U.S. ___, ___, 105 S.Ct. 2265, 2274, 85 L.Ed.2d 652 (1985). Here, the handbills are both prohibited by statute and false and deceptive. Moreover, the restriction imposed by statute serves the substantial governmental interest of maintaining industrial peace.