IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 98-50335

_____

WALTER GEORGE,

                              Plaintiff-Appellant,

        versus

NATIONAL ASSOCIATION OF LETTER CARRIERS;
LOCAL BRANCH #1037,

                              Defendants-Appellees.

_____

Appeal from the United States District Court for the
Western District of Texas

_____

August 16, 1999

Before GARWOOD, BARKSDALE and BENAVIDES, Circuit Judges.

GARWOOD, Circuit Judge:

        Plaintiff-appellant Walter George (George) sued defendants-
appellees National Association of Letter Carriers (NALC) and its
Local Branch No. 1037 (the local) for alleged unfair labor
practices and tortious interference with contract.  The district
court granted summary judgment in favor of the defendants-
appellees.  We affirm.

**Facts and Proceedings Below**

In November 1992, George retired from a twenty-seven-year career in the United States Postal Service. In May 1993, George began performing consultant services for the Postal Service on a contractual basis. George evaluated letter carriers' work habits, monitored delivery routes, and sought ways to increase efficiency. In October 1993, George also began working as an independent sales representative for Brookfield Uniforms (Brookfield), a company licensed by the Postal Service to sell uniforms to letter carriers. George was compensated on a commission basis. His relationship with Brookfield had no stated or implied term. George sold uniforms to letter carriers in the Midland-Odessa, Texas, region.

George contracted with the Postal Service to inspect its Amarillo Jordan station between February and April, 1996. The Jordan station is outside the region in which George sold uniforms. The letter carriers at the Jordan station were represented in collective bargaining by NALC. Many were members of the local.

Pursuant to an arrangement with the Postal Service, George took a week's absence from the Jordan station to fulfill his responsibilities for Brookfield. After inquiring about George's absence, some Jordan letter carriers learned that George was a Brookfield salesman. This news upset the letter carriers. George had determined that some Jordan letter carriers had poor work habits, and had reported observations of "sloppiness" and "sloth"

to the Postal Service.  The letter carriers argue that they were upset by George's "dual life": on one hand harassing the Jordan letter carriers as a management figure, while on the other posing as a friend to the letter carriers in Midland-Odessa and profiting by selling uniforms to them.

George's so-called "dual life" became a topic of discussion at the local's next few meetings.  After the local's April 1996 meeting, local representative Dianna Williams (Williams) contacted Brookfield's area manager Phil Hampton (Hampton) to confirm that George was a Brookfield sales representative and to discuss what the Jordan letter carriers perceived to be a conflict of interest. Hampton subsequently telephoned George and informed him of the conversation with Williams.  Hampton asked George whether he intended to return to the Jordan station.  George answered that he likely did not.  Hampton asked George to sign a letter stating that he would not go back to the Jordan station, but George refused.  An undetermined time later, Hampton relayed this information to Williams.

When George later returned to the Jordan station, the letter carriers were upset.  At its June 11, 1996, meeting, the local passed a motion to write letters to the NALC locals in the Midland-Odessa area in which George sold uniforms, asking their members not to buy uniforms from Brookfield.  After the meeting, Williams phoned Hampton and advised him of the motion.  Hampton asked whether he could do anything to remedy the situation.  Williams

3

invited Hampton to come to Amarillo.

Hampton feared a boycott. Although the NALC bylaws do not require local chapters to follow other locals' boycotts, Hampton realized that it is common practice among labor unions to do so. Sales in the Midland-Odessa region would suffer. More importantly, although the local did not threaten to contact any NALC locals other than those in the Midland-Odessa region, Hampton feared that the boycott would spread. Hampton knew that the minutes for a given meeting of the local were normally prepared after that meeting and approved at the next meeting and that the local regularly published the thus-approved minutes of its meetings in a newsletter which it distributed to NALC locals nationwide. Hampton feared that other NALC locals might read about the local's June 11 motion and also withhold patronage from Brookfield. Furthermore, the NALC's national convention was approaching. Hampton feared that news of the local's request would spread through word-of-mouth, and that the boycott might thus spread as well.

Hampton left a message on George's answering machine stating that he was going to Amarillo to speak with the letter carriers, and that they had been discussing a possible boycott. On June 18, Hampton struck a deal with some members of the local. These members insisted that Hampton fire George. In exchange, the local would retract the June 11 motion and expunge all discussion of the motion from its minutes. When he returned from Amarillo, Hampton left a message on George's answering machine, stating that in order

4

to prevent a boycott, Brookfield was terminating its relationship with George.

George alleges that the local's proposed letter writing constituted an unfair labor practice under section 8(b)(4) of the National Labor Relations Act, as amended, 29 U.S.C. § 158(b)(4)(ii)(B). George sued the local and NALC under 29 U.S.C. § 187(b), which provides a private cause of action to any person injured in business or property by a violation of section 8(b)(4)(ii)(B). George also sued both the local and NALC for tortious interference with contract under Texas law. The district court granted summary judgment for defendants-appellees. We affirm.

## Discussion

This Court reviews the grant of summary judgment *de novo*, applying the same standards as the district court. *Merritt-Campbell, Inc. v. RxP Products, Inc*., 164 F.3d 957, 961 (5th Cir. 1999). Summary judgment is proper only where, viewing the evidence in the light most favorable to the nonmoving party, the court determines that there is no genuine issue of material fact and judgment is proper as a matter of law. *Id.;* Fed. R. Civ. P. 56(c).

I. Section 8(b)(4)(ii)(B)

Section 8(b)(4)(ii)(B) of the National Labor Relations Act, as amended, makes it an unfair labor practice for a labor organization

or its agents to "threaten, coerce, or restrain" any person engaged in commerce or in an industry affecting commerce where an object thereof is "forcing or requiring any person to," among other things, "cease doing business with any other person." 28 U.S.C. § 158(b)(4)(ii)(B).[1] The statute was enacted to prohibit certain secondary boycotts. Described as "one of the most effective weapons in labor's economic arsenal," a secondary boycott generally involves a labor union's exertion of pressure on a neutral employer with whom the union has no dispute, in order to force that neutral employer to stop dealing with the primary employer with whom the union does have a labor dispute. *See* 2 *The Developing Labor Law* 1211 (Patrick Hardin *et al.*, eds., 3d ed. 1992). One of Congress' primary aims in prohibiting certain secondary boycotts was "'shielding . . . unoffending employers and others from pressures in controversies not their own.'" *See Edward J. DeBartolo Corp. v. N.L.R.B.*, 103 S.Ct. 2926, 2932 (1983) (*DeBartolo I*) (quoting *NLRB*

---

[1]
> "It shall be an unfair labor practice for a labor organization or its agents
>
> . . .
>
> to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is
>
> . . .
>
> forcing or requiring any person . . . to cease doing business with any other person. . . ."

*v. Denver Building and Construction Trades Council*, 71 S.Ct. 943, 953 (1951)). However, section 8(b)(4) does not expressly use the term secondary boycott, nor does it prohibit all secondary boycott activity by labor unions. *See N.L.R.B. v. Fruit and Vegetable Packers and Warehousemen,* 84 S.Ct. 1063 (1964) (*Tree Fruits*). *Cf. Local 1976, United Brotherhood of Carpenters and Joiners of America v. N.L.R.B.*, 78 S.Ct. 1011, 1015 (1958) ("[Section 8(b)(4)(A)] does not speak generally of secondary boycotts. It describes and condemns specific union conduct directed to specific objectives."). Section 8(b)(4)(ii)(B) prohibits only the use of threats, coercion, or restraint for the purpose, *inter alia*, of forcing any person engaged in commerce to cease doing business with any other person.

George argues that the local threatened, coerced, or restrained Hampton and Brookfield by threatening to boycott Brookfield if Hampton did not terminate George, and that as a result Brookfield, through Hampton, did terminate its relationship with George. Even accepting as true, as we must for purposes of summary judgment, that in light of the local's demands Hampton felt he had no economically reasonable choice but to terminate George,[2] we conclude that the local did not threaten, coerce, or restrain Hampton within the meaning of section 8(b)(4)(ii)(B).

---

[2] As George's relationship with Brookfield was entirely indefinite as to duration, having no stated or implied term, Brookfield was legally free to terminate it at will and at any time. *See Trient Partners v. Blockbuster Entertainment*, 83 F.3d 704, 708 (5th Cir. 1996).

7

A. Threats, Coercion, or Restraint

The Supreme Court examined the meaning of threats, coercion, and restraint under section 8(b)(4)(ii)(B) in *Tree Fruits*. In that case, a labor union struck several firms of fruit packers and warehousemen that sold Washington State apples to Safeway grocery stores. *See Tree Fruits*, 84 S.Ct. at 1064. In support of the strike, the union fostered a consumer boycott against the apples. Union picketers walked back and forth, wore placards, and distributed handbills in front of customer entrances to Safeway stores in the Seattle, Washington, area. The handbills asked customers not to purchase the apples. Both the placards and the handbills clearly noted that the picketing was directed against the apples and their packers only. *See id*. at 1065 n.3. The union had no dispute with Safeway, and did not ask consumers to cease doing business with Safeway. *See id*. at 1065.

The union was charged with violating section 8(b)(4), and the case was submitted to the National Labor Relations Board (Board). The Board held that section 8(b)(4)(ii)(B) prohibited all secondary consumer picketing at secondary sites. *See id.* at 1066. Section 8(b)(4) contains a proviso which states, in pertinent part,

> "That for the purposes of this paragraph (4) only, nothing contained in such paragraph shall be construed to prohibit publicity, other than picketing, for the purpose of truthfully advising the public, including consumers and members of a labor organization, that a product or products are produced by an employer with whom the labor organization has a primary dispute and are distributed by another employer . . . ."

8

Because the proviso excludes picketing, the Board inferred that all consumer picketing must be coercive. *See id*. at 1065-1066. The Court of Appeals for the District of Columbia Circuit reversed, holding that a showing of threats, coercion, or restraint required a finding that Safeway would suffer a substantial economic impact as a result of the boycott. *See id.* at 1066. After reviewing the legislative history and intent of section 8(b)(4), the Supreme Court rejected both interpretations and held that the statute simply did not prohibit the union's conduct.

The Court observed that both congressional policy and the Court's interpretive principles "reflect concern that a broad ban against peaceful picketing might collide with the guarantees of the First Amendment." *Id.* Respectful of this tension between labor regulation and free speech, "Congress has consistently refused to prohibit peaceful picketing except where it is used as a means to achieve specific ends which experience has shown are undesirable." *Id.* In other words, Congress has prohibited picketing only when used to advance specific wrongful ends, or "isolated evils." *See id. Cf. also* Hardin *et al., supra*, at 1215 (identifying prohibited conduct and prohibited object under earlier version of the statute). Recognizing this policy of legislating only against isolated evils, the Court would not infer a legislative intent to ban picketing absent "'the clearest indication in the legislative history' [citation] that Congress intended to do so as regards the

9

particular ends of the picketing under review." *Tree Fruits*, 84 S.Ct. at 1066 (citation omitted).

Congress did not intend section 8(b)(4) to prohibit all consumer picketing. In contrast to section 8(b)(4), which requires a showing that the union has acted to threaten, coerce, or restrain, section 8(b)(7) explicitly bans all picketing. *See Tree Fruits*, 84 S.Ct. at 1069. ("When Congress meant to bar picketing per se, it made its meaning clear . . . . In contrast, the prohibition of § 8(b)(4) is keyed to the coercive nature of the conduct, whether it be picketing or otherwise."). *Id.*

Congress enacted section 8(b)(4)(ii)(B) specifically to prohibit picketing used to cut off a secondary employer's business, in order to force the secondary employer to cease doing business with the primary employer. *See id.* When a union pickets in order to shut off the business of a secondary employer, the union expands its dispute with the primary employer, and seeks to involve the secondary employer in its primary dispute. *See id.* at 1067. Furthermore, when the union asks customers to cease patronizing a secondary employer, the union creates an additional, separate dispute with that secondary employer. *Id.* at 1071 (footnote omitted).

The picketing in *Tree Fruits,* however, targeted only the struck apples. The union did not ask consumers to cease all shopping at Safeway, and made no effort to cut off Safeway's

10

business generally. The dispute merely followed the struck product, and although the picketing moved to the secondary employer's premises, the dispute did not expand to engulf the secondary employer. *See id.* at 1066. The picketing outside Safeway did not have the proscribed object of cutting off the secondary employer's business generally, and therefore was not the "isolated evil" prohibited by section 8(b)(4).

The Court held that the proviso's exclusion of picketing did not necessarily indicate that all picketing is coercive. *See id.* at 1070 ("[I]t does not follow from the fact that some coercive conduct was protected by the proviso, that the exception ‹other than picketing' indicates that Congress had determined that all consumer picketing was coercive."). Moreover, the Court expressly rejected the Court of Appeals' holding that the relevant inquiry was whether the picketing caused economic harm to the secondary employer. Where the legislative history lacked a clear intent to ban the sort of picketing conducted, "a violation of § 8(b)(4)(ii)(B) would not be established, merely because respondents' picketing was effective to reduce Safeway's sales of Washington State apples, even if this led or might lead Safeway to drop the item as a poor seller." *See id.* at 1071.

The Court concluded that Congress did not intend to ban all picketing by section 8(b)(4), but was instead "following its usual practice of legislating against peaceful picketing only to curb

11

<isolated evils.'" *Id.* at 1070. Because the union limited its dispute to the struck product and did not ask consumers to cease doing business generally at Safeway, the single-product picketing was not the "isolated evil" which the statute prohibited.[3]

However, single product consumer picketing did violate section 8(b)(4)(ii)(B) where that picketing "predictably encourage[d] consumers to boycott a neutral party's business." *See National Labor Relations Board v. Retail Store Employers Union*, 100 S.Ct. 2372, 2374 (1980) (*Safeco*). Safeco Title Insurance Company maintained close business relationships with five title companies. At the time the labor dispute arose, over ninety percent of each of these companies' income was derived from sales of Safeco insurance policies. *Safeco*, 100 S.Ct. at 2375. When the union struck Safeco, the union fostered a consumer boycott against Safeco policies and picketed in front of the title companies. The union picketers at the title companies carried signs announcing their dispute with Safeco and distributed handbills asking consumers to cancel their Safeco policies. Because Safeco policies constituted

---

[3]     Justice Douglass did not participate in the consideration or decision of the case. In a concurring opinion, Justice Black agreed with the dissent's analysis that the boycott violated the statute. However, differing with the dissent, Justice Black concluded that the statute placed a content-based restriction on speech and thus violated the First Amendment. Justice Harlan, joined by Justice Stewart, dissented. Justice Harlan concluded that the statute prohibited all secondary consumer picketing, and did not distinguish between picketing aimed at a single product and picketing aimed at a boycott of the neutral employer altogether.

over ninety percent of the title companies' businesses, the picketing was "reasonably calculated to induce customers not to patronize the neutral parties at all." *Id.* at 2377 (internal quotation marks, citation, and footnote omitted.). The Court therefore held that the picketing violated section 8(b)(4)(ii)(B).

The *Safeco* Court distinguished *Tree Fruits* because the insurance policies constituted such a large share of the business of each of the title companies. If the single product picketing in *Tree Fruits* were successful, the grocery store might only lose profits from the sale of the Washington State apples. The marginal effect on the store would be "purely incidental to the product boycott." *Id.* However, where the struck product constituted almost the entirety of the secondary retailers' businesses, there was little difference between a boycott of the targeted product and a boycott of the secondary retailers altogether. *See id.* "Since successful secondary picketing would put the title companies to a choice between their survival and the severance of their ties with Safeco," the picketing violated section 8(b)(4). *Id.* at 2377-78.

A four-justice plurality of the *Safeco* Court held that, because Congress may prohibit picketing in furtherance of unlawful objectives, the application of section 8(b)(4) to the facts of that case did not violate the First Amendment. *See id.* at 2378. Departing on this point, Justice Blackmun and Justice Stevens each issued concurring opinions which augmented the plurality's brief

13

discussion of First Amendment concerns.[4] Justice Brennan, joined by Justices White and Marshall, dissented.[5]

The *DeBartolo* case arose out of a dispute between a union and the H.J. High Construction Company (High), which employed nonunion workers. DeBartolo owned and operated a shopping mall which leased space to store owners. *Edward J. DeBartolo Corp. v. Florida Gulf Coast Building and Construction Trades Council*, 108 S.Ct. 1392, 1395 (1988) (*DeBartolo II*). H.J. Wilson Company (Wilson), a tenant of DeBartolo's, had retained High to construct its new department store at the mall. Neither DeBartolo nor any of the mall's some eighty-five other tenants had a legal right to control whom Wilson hired to construct its store. The union had no dispute with

---

[4]   Justice Blackmun held that Congress had lawfully struck a "delicate balance between union freedom of expression and the ability of neutral employers, employees, and consumers to remain free from coerced participation in industrial strife." *Id*. at 2379 (Blackmun, J., concurring). Justice Stevens concluded that the statute was constitutional based on the fact that picketing was not pure speech, and that in the labor context, "the conduct element" of picketing provided a more effective deterrent to the neutral's customers than did the speech itself. *See id.* at 2379-80 (Stevens, J., concurring). Justice Stevens also noted that "'the very presence of a picket line may induce action of one kind or another, quite irrespective of the nature of the ideas which are being disseminated. Hence those aspects of picketing make it the subject of restrictive regulation'" (quoting Justice Douglas's concurring opinion in *Bakery Drivers v. Wohl*, 62 S.Ct. 816, 819-20 (1942)). *Id*. at 2379-80.

[5]   The dissent disagreed that the threat of economic harm defined whether the boycott was permissible. Instead, the dissent would have followed *Tree Fruits* and continued to hold that the statute distinguished only between boycotts aimed at single products and those aimed at secondary employers altogether. *See Safeco*, 100 S.Ct. at 2380-2382 (Brennan, J., dissenting).

14

Wilson, DeBartolo, or any other mall tenant.

Outside each of the mall's four entrances, the union distributed handbills stating that Wilson's store was being built by contractors receiving substandard wages and that "[t]he payment of substandard wages not only diminishes the working person's ability to purchase with earned, rather than borrowed, dollars, but it also undercuts the wage standard of the entire community." *See id.* at 1395 n.1. The handbills asked consumers to withhold all business from the mall until DeBartolo publicly promised that all construction performed at the mall would meet union standards. The union's message was limited to the handbills. No pickets or patrols were set up. *Id.* at 1395 ("the union peacefully distributed the handbills without any accompanying picketing or patrolling"), 1398 ("no picketing or patrolling was involved"), and 1399 ("There was no violence, picketing, or patrolling, and only an attempt to persuade customers not to shop in the mall").

DeBartolo advised the union that he would not object to the handbilling if the union would clarify that its dispute was limited to the Wilson construction and did not involve DeBartolo or any other mall tenant, and if the union would limit its handbilling to the area surrounding Wilson's store. When the union refused, DeBartolo filed a complaint with the Board, alleging that the handbilling violated section 8(b)(4). *See id.* at 1395.

Initially, the Board held that the union's actions were

15

protected by the proviso. *See id.* The Supreme Court reversed that decision, holding that the proviso did not apply to the mall tenants (other than Wilson) because the tenants were not distributors of any product produced by the employer with whom the union had the primary dispute (High). *See id.* at 1396; *DeBartolo I*, 103 S.Ct. at 2932-33. Because the Board had not determined whether, absent the proviso, the statute prohibited the handbilling, the Court remanded the case. *Id.*

On remand, the Board concluded that handbilling urging a consumer boycott constituted coercion, and violated section 8(b)(4)(ii)(B). *See DeBartolo II*, 108 S.Ct. at 1396. The Eleventh Circuit refused to enforce the Board's order. Because the Board's interpretation of the statute raised significant constitutional questions, the Court of Appeals refused to hold that section 8(b)(4)(ii) banned mere consumer handbilling in the absence of clear legislative intent to do so. Further, the Court of Appeals held that the proviso was merely an explanatory section and did not create an exception to an otherwise broad ban on non-picketing publicity. *See id.* at 1397.

The Supreme Court agreed, relying on the rule that "where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." *Id.* (citing *National Labor Relations*

16

*Board v. Catholic Bishop of Chicago*, 99 S.Ct. 1313, 1318-1319 (1979)). The Court noted in this connection that

> "the Board's construction of the statute, as applied in this case, poses serious questions . . . under the First Amendment. The handbills involved here truthfully revealed the existence of a labor dispute and urged potential customers of the mall to follow a wholly legal course of action, namely, not to patronize the retailers doing business in the mall. The handbilling was peaceful. No picketing or patrolling was involved." *Id.* at 1398.

It went on to observe that "[w]e do not suggest that communications by labor unions are never of the commercial speech variety and thereby entitled to a lesser degree of constitutional protection," but further noted that "[t]he handbills involved here, however, do not appear to be typical commercial speech" and that in any event "commercial speech itself is protected by the First Amendment" and thus "however these handbills are to be classified, the Court of Appeals was plainly correct in holding that the Board's construction would require deciding serious constitutional issues." *Id.*

The Court then stated its conclusion that section 8(b)(4)(ii)(B) "is open to a construction that obviates deciding whether a congressional prohibition of handbilling on the facts of this case would violate the First Amendment." *De Bartolo II*, 108 S.Ct. at 1399. It reasoned that the words "threaten, coerce, or restrain" of section 8(b)(4)(ii) do not limit themselves to a reading so broad as to include peaceful handbilling. *Id.* Whereas

17

section 8(b)(4)(ii) prohibits threats, coercion, or restraint in the pursuit of certain ends, section 8(b)(4)(i) prohibits any labor organization "to induce or encourage" any person employed by a secondary employer to strike or refuse to work. The words "to threaten, coerce, or restrain" therefore require more than mere persuasion. *Id.* In *DeBartolo II*, however, the union had done no more than attempt to induce or encourage mall customers to support its boycott. *See id.* ("There was no violence, picketing, or patrolling and only an attempt to persuade customers not to shop in the mall."). Such acts did not amount to coercion or restraint under the statute. Furthermore, *Tree Fruits* foreclosed the possibility that all consumer appeals having adverse economic impact on the neutral party constitute coercion within section 8(b)(4)(ii)(B). *See id.* at 1400.

The Court found no clear indication in the legislative history of section 8(b)(4)(ii)(B) that Congress intended to ban peaceful handbilling of a secondary employer, unaccompanied by picketing. *See id.* at 1402. The legislative proponents of section 8(b)(4)(ii)(B) were chiefly concerned with the problem of secondary boycotts carried out by picketing. *See id.* The legislative history reflected no intent to ban handbilling or other nonpicketing appeals such as newspaper or radio ads. *See id.*

The Court again rejected the argument that the proviso created an exception to an otherwise broad ban of publicizing labor

18

disputes at secondary sites. "It may indicate only that without the proviso, the particular nonpicketing communication the proviso protects might have been considered to be coercive, even if other forms of publicity would not be." *Id.* at 1401. "Section 8(b)(4), with its proviso, may thus be read as not covering nonpicketing publicity" at all. *Id.*

This view was reinforced by a summary analysis of the House-Senate Conference compromise bill, which ultimately resulted in section 8(b)(4)(ii)(B). *See id.* at 1403 ("§ 8(b)(4)(ii)(B) was one of the amendments agreed upon by a House-Senate Conference on the House's Landrum-Griffin bill and the Senate's Kennedy-Ervin bill"). The analysis stated that "the House provision prohibiting secondary consumer picketing was adopted but ˹with clarification that other forms of publicity are not prohibited.'" *Id.* (citations and footnote omitted). "The clarification referred to was the [proviso]." *Id.*

Senator Kennedy, chairman of the Conference Committee, reported that the Senate conferees were not able to persuade House conferees to allow picketing in front of secondary sites. However, the Senate conferees "were able to persuade them to agree that the union shall be free to conduct informational activity short of picketing." *Id.* (quoting 105 Cong. Rec. 17898-17899, 2 Leg. Hist. 1432). Senator Kennedy assured the Senate that a "'union can hand out handbills at the shop, can place advertisements in newspapers,

can make announcements over the radio, and can carry on *all publicity short of having ambulatory picketing in front of a secondary site*.'" *DeBartolo II*, 108 S.Ct. at 1403-04 (emphasis added) (quoting 105 Cong. Rec. 17898-17899, 2 Leg. Hist. 1431-1432).

Furthermore, Senator Kennedy stated that the Committee's bill would not prohibit publicity urging consumers to buy American-made items, commonly known as buy-American campaigns. Because buy-American campaigns do not typically involve any primary dispute, such publicity would not fall under the proviso. If the proviso were merely an exception to a ban on advertising at secondary sites, buy-American campaigns would have been prohibited. *Id*. at 1404.

The Court found no clear indication that Congress intended section 8(b)(4)(ii)(B) to proscribe handbilling unaccompanied by picketing. *See id.* The *DeBartolo II* Court concluded that section 8(b)(4)(ii)(B) simply does not extend to prohibit non-picketing publicity.[6]

B. Picketing vs. Nonpicketing Publicity

George argues that the true measure of "threats, coercion, or restraint" is the threat of economic consequences. George argues that to threaten, coerce, or restrain means to take any action

---

[6]    Justice O'Connor and Justice Scalia concurred in the judgment, but did not issue separate opinions. Justice Kennedy took no part in the consideration of the case. *See id*. at 1404.

20

which leaves a secondary employer believing he has no choice but to acquiesce or suffer substantial economic harm. The distinction between picketing and nonpicketing activity, George argues, is merely superficial.

The possibility of economic ramifications, however, does not transform otherwise lawful conduct into "threats, coercion, or restraint" under the statute. While the Court did evaluate the economic realities of the boycott in *Safeco,* that consideration was limited to the inquiry of whether the *picketing* was in fact the "isolated evil" which the statute proscribed. The Court did not, as George's argument implies, examine Safeco's economic predicament without first finding (at least potentially) prohibited conduct.

Under George's theory, any form of publicity, such as the proposed letter-writing or even an aggressive advertising campaign, would constitute "coercion, threats, or restraint" if it effectively persuaded consumers not to patronize a secondary employer. There is no evidence that Congress intended such a result, and, more importantly, *DeBartolo II* forecloses the possibility of this interpretation of section 8(b)(4)(ii). *See Storer Communications, Inc. v. National Association of Broadcast Employees and Technicians,* 854 F.2d 144, 147 (6th Cir. 1988) ("The Supreme Court [in *DeBartolo II*] held that peaceful handbilling does not constitute coercive, threatening, or restraining activity in violation of Section 8(b)(4)(ii)(B), even when the handbilling

21

urges a total consumer boycott of neutral secondary businesses.")
(citing *DeBartolo II*, 108 S.Ct. at 1404).

The distinction between picketing and nonpicketing is not, as
George argues, a mere formality.  In *DeBartolo II*, the Court
distinguished at length the coercive nature of picketing, separate
from its speech elements, from peaceful handbilling.  In fact, the
Court expressly distinguished picketing from other forms of speech
no less than ten times:  (1.)  Distinguishing the boycott in
*Safeco*, the Court noted that "picketing is qualitatively different
from other modes of communication."  *Id.* at 1400 (internal
quotation marks and citations omitted).  (2.) Similarly, where the
*Tree Fruits* Court had noted that consumer boycotts can in certain
circumstances be coercion under section 8(b)(4), the *DeBartolo II*
Court limited that discussion to the context of picketing.  *See*
*DeBartolo II*, 108 S.Ct. at 1400 n.4.  ("The Board points out that
Tree Fruits indicates urging customer boycotts can be coercion
within the meaning of § 8(b)(4).  [Citations].  But the Court was
there talking about picketing and not mere handbilling.")
(citations omitted).  (3.)  Unlike handbilling, which merely
promotes written ideas, "[p]icketing is ‹a mixture of conduct and
communication' and the conduct element ‹often provides the most
persuasive deterrent to third persons about to enter a business
establishment.'"  *Id.* at 1400 (quoting *Safeco*, 100 S.Ct. at 2379
(Stevens, J., concurring)).  (4.)  Although the distribution of

22

written messages such as "circulars" may convey the same information, "the very purpose of a picket line is to exert influences, and it produces consequences, different from other modes of communication." *Id.* at 1400 (quoting *Hughes v. Superior Court*, 70 S.Ct. 718, 721 (1950)).[7]

(5.) "There is even less reason [than in *Tree Fruits*] to find in the language of § 8(b)(4)(ii)(B), standing alone any clear indication that handbilling, without picketing, 'coerces' secondary employers. The loss of customers because they read a handbill urging them not to patronize a business, and not because they are intimidated by a line of picketers, is the result of mere persuasion." *Id*. *See also, e.g.,* (6.) *id.* at 1401 ("Section 8(b)(4), with its proviso, may thus be read as not covering nonpicketing publicity . . . ."); (7.) *id.* at 1402 n.6 ("Consumer picketing against the distributor of a struck manufacturer's product was the paradigm case considered in the debates."); (8.) *id.* at 1402 ("Neither do we find any clear indication in the relevant legislative history that Congress intended § 8(b)(4)(ii)(B) to proscribe peaceful handbilling, unaccompanied by picketing . . . ."); (9.) *id.* ("[A]mong the concerns of the

---

[7]    *See also Bakery & Pastry Drivers Local 802 v. Wohl*, 62 S.Ct. 816 (1942) (Douglass, J., concurring) ("Picketing by an organized group is more than free speech, since it involves patrol of a particular locality and since the very presence of a picket line may induce action of one kind or another, quite irrespective of the nature of the ideas which are being disseminated.").

23

proponents of the provision barring threats, coercion, or restraints aimed at secondary employers was consumer boycotts of neutral employers carried out by picketing. At no time did they suggest that merely handbilling the customers was one of the evils at which their proposal was aimed."); (10.) *id.* at 1400 n.3 ("The absence of picketing in the present case distinguishes it from *Honolulu Typographical" Union v. NLRB*, 401 F.2d 952 (D.C. Cir. 1968)).

It is thus clear that *DeBartolo II* turned on the conclusion that handbilling, where unaccompanied by picketing or patrolling, was not coercive, threatening, or restraining, within the meaning of section 8(b)(4)(ii), and that it was only the absence of picketing or patrolling which distinguished *DeBartolo II* from *Safeco*. In *DeBartolo II*, the union was requesting a total boycott of the mall and its shops, but nothing in the Court's opinion indicates whether or not this posed a significant risk of serious economic harm to the mall or the shops there and the opinion does not evaluate or consider that risk. *DeBartolo II* is thus clearly inconsistent with George's analysis.

Moreover, since *DeBartolo II*, the Board has drawn a clear distinction between picketing and nonpicketing publicity at secondary sites. *See NLRB v. United Ass'n of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada*, 302 NLRB 919 (1991), 1991 WL 150567 (N.L.R.B.)

(*Ramada*) (citing *Service Employees Local 399 (Delta Air Lines)*, 293 NLRB 602 (1989), and *Steelworkers (Pet, Inc.)*, 288 NLRB 1190 (1988)). In these cases, "the Board emphasized, as the Supreme Court had in DeBartolo, the absence of violence, picketing, and patrolling attendant to the handbilling and other publicity, and found instead that the unions merely had attempted to persuade customers not to patronize the neutral employers. That persuasion was found not to be coercive." *Ramada*, 302 NLRB at 920 (internal footnote omitted).

Ramada had hired a general contractor, which in turn hired a nonunion subcontractor. The union's business manager wrote a letter to Ramada's president and chairman of the board, objecting to the use of the nonunion subcontractor and threatening to organize labor support for a boycott against Ramada Inns as well as to distribute handbills advertising the dispute to potential customers. The letter closed with the ominous warning: "It looks like the beginning of a full scale war with the Ramada Inn as the battlefield." *Id.* at 919.

The administrative law judge held that the union had violated section 8(b)(4)(ii)(B). The administrative law judge found that a boycott by the union's affiliated labor groups would pressure Ramada into rescinding its contract with the general contractor. Furthermore, the administrative law judge held that "the unqualified pugnaciousness" of the letter distinguished the

25

handbilling from that in *DeBartolo*.

The Board disagreed, and held that the union's proposed conduct did not violate section 8(b)(4)(ii)(B). The mere attempt to persuade customers not to patronize a particular establishment, unaccompanied by violence, picketing, or patrolling, is not coercion under section 8(b)(4)(ii). Because the threatened conduct was not coercive, the union's threat to engage in that conduct did not violate the statute. *See id.* ("The statutory protection for the distribution of handbills would be undermined if a threat to engage in protected conduct were not itself protected.") (quoting *NLRB v. Servette*, 84 S.Ct. 1098, 1105 (1964) (footnote omitted)).[8]

The local's conduct here was no more coercive than the pugnacious behavior of the union in *Ramada*. The local never mentioned picketing, patrolling, or any other coercive, threatening, or restraining conduct. The local threatened only to write another NALC local urging its members not to patronize Brookfield. This action simply is not coercive, threatening, or restraining behavior under section 8(b)(4)(ii)(B). We note that in *DeBartolo II* the Court rejected any construction of section 8(b)(4)(ii) under which "it would be an unfair labor practice for unions in their own meetings to urge their members not to shop in

---

[8] *See also BE&K Construction Co. v. United Brotherhood of Carpenters*, 90 F.3d 1318, 1330-31 (quoting same passage of *Servette*), 1328 ("threats or warnings that a union will engage in protected conduct such as handbilling . . . are not a violation of federal law") (8th Cir. 1996).

26

the mall." *Id.*, 108 S.Ct. at 1402. And, we agree with the Board's conclusion in *Ramada* that a labor organization's purely communicative effort to persuade members of a fellow labor organization to join them in a boycott does not violate section 8(b)(4)(ii)(B).[9] Moreover, letter writing—which is what the local proposed here—has even fewer potentially coercive, threatening, or restraining characteristics than does even handbilling or other in-person communication, and has been held, albeit in other contexts, to enjoy correspondingly greater First Amendment protection. *See, e.g., Shapero v. Kentucky Bar Ass'n*, 108 S.Ct. 1916, 1922-23 (1988).

We hold that the district court correctly granted summary judgment that the local did not violate 8(b)(4)(ii)(B).[10]

II.  Tortious Interference

George also sued the local and NALC for tortious interference with contractual relations under Texas law. *See Texas Beef Cattle Co. v. Green*, 921 S.W.2d 203, 210 (Tex. 1996). The elements of

---

[9] George relies on our decision in *Brown & Root, Inc. v. Louisiana State AFL-CIO*, 10 F.3d 316 (5th Cir. 1994). However, we there held, in reliance on *DeBartolo II*, that the union's First Amendment protected activity did not violate section 8(b)(4)(ii)(B). *See id*. at 325-27. Nothing in our holding there supports George's section 8(b)(4)(ii) claim.

[10] We recognize that this case does not present a typical secondary boycott because the local has no dispute with its primary employer, the Postal Service. However, in *International Longshoremen's Association v. Allied International, Inc.*, 102 S.Ct. 1656 (1982), the Court held that the prohibitions contained in section 8(b)(4) apply even in the absence of a primary dispute.

27

tortious interference with contract under Texas law are: "(1) the existence of a contract subject to interference; (2) a willful and intentional act of interference; (3) the act was a proximate cause of the plaintiff's damages; and (4) actual damage or loss." *Id.* (citation omitted). However, Texas law also provides the affirmative defense of justification to interference torts where the interfering party acts in a *bona fide* exercise of a legal right. *Id.*

George concedes in his brief to this Court that "if the union's secondary boycott falls outside the scope of § 8(b)(4) because of First Amendment concerns, the boycott would also enjoy a defense under Texas law."[11] As noted, the scope of section

---

[11] This portion of George's brief responds to appellees' claim made below and reiterated on appeal that federal labor law preempts George's Texas law tortious interference claim. The passage from George's brief quoted in the text is part of the following argument, *viz*:

> "The district court did not decide this issue, but it is apparent that plaintiff's state law claim of tortious interference neither conflicts with federal labor law nor frustrates federal labor policy. There is no actual conflict because Texas law provides a defense to liability for tortious interference if the defendant is justifiably exercising a legal right. *Texas Beef Cattle Co. v. Green*, 921 S.W.2d 203, 211 (Tex. 1996). Thus, if the union's secondary boycott falls outside the scope of § 8(b)(4) because of First Amendment concerns, the boycott would also enjoy a defense under Texas law."

Apart from his contention that it is not preempted, George's brief contains no argument that his Texas tortious interference claim would be viable if the local's conduct was not proscribed by section 8(b)(4)(ii).

8(b)(4)(ii) has been narrowly construed, in major part, precisely because of First Amendment concerns. Since George has not taken the position on appeal that the local may have violated Texas tort law even if the local's actions were not proscribed by section 8(b)(4)(ii), we do not examine that issue today. For the same reason, we do not address whether federal labor law preempts a state law interference with a contractual relations claim.

III. NALC Liability

Finally, as we affirm the district court's dismissal of George's claims against the local on the foregoing bases, and as George seeks to hold NALC liable only on the theory that the local was its agent or it ratified the local's actions, we likewise affirm the dismissal of George's claims against NALC and do not reach the issues of agency or ratification.

## Conclusion

For the reasons stated, the judgment of the district court is

AFFIRMED.

29